## BRINKMAN v. LAURETTE MFG. CO. et al.

District Court, D. New Jersey. September 23, 1927.

1. Patents ⊜⇒328—1,569,942 for reversible hat held valid as to claims 1–3, infringed as to claim 3, and not directly infringed as to claims 1 and 2.

Barnhill patent, No. 1,569,942, for reversible hat, held valid as to claims 1–3, and directly infringed as to claim 3, but not indirectly or contributorily infringed as to claims 1 and 2.

2. Patents ⊜⇒226—Mere capability of being turned into infringing article does not constitute "infringement."

Mere capability of being turned into infringing article does not constitute "infringement."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Infringement.]

**3. Trade-marks and trade-names and unfair competition** ⊗⟹**70(1)—Manufacture and sale of reversible hats similar to plaintiff's patented hat held unfair competition, though plaintiff's patent was not infringed.**

Where exclusive selling agent of plaintiff, a manufacturer of a patented reversible hat, on terminating his agency contract, with other defendants organized corporations for manufacture and sale of hats so similar to plaintiff's that slight changes therein by salesmen or buyers would produce same effect as plaintiff's hats, and used sales methods and advertisements similar to plaintiffs in order to appropriate plaintiff's profits resulting from good will, *held* that defendants were guilty of unfair competition, though defendants' hats did not infringe plaintiff's patent, and the continued sale of such hats without distinguishing marks clearly indicating that they are not plaintiff's will be enjoined.

**4. Trade-marks and trade-names and unfair competition** ⊗⟹**68(1)—Whether competition is unfair depends on facts of case and not on legal definitions.**

Whether competition is fair or unfair must be determined from particular facts of the case rather than from attempted legal definitions.

**5. Trade-marks and trade-names and unfair competition** ⊗⟹**75—Failure to show specific instances of confusion or deception in sale of hats similar to plaintiff's patented hat held not controlling on question of unfair competition.**

Where evidence showed other acts of unfair competition by defendants in sale of reversible hats similar to plaintiff's patented hat, plaintiff's failure to show specific instances of confusion or deception of buyers *held* not controlling on question of unfair competition.

In Equity. Suit by Frederick A. Brinkman, doing business as the Betty B Hat Company, against the Laurette Manufacturing Company and others for patent infringement and unfair competition. Decree for plaintiff.

Pitney, Hardin & Skinner, of Newark, N. J. (Arthur C. Brown, of Kansas City, Mo., and Carl Feick, of Newark, N. J., of counsel), for plaintiff.

Lindabury, Depue & Faulks, of Newark, N. J. (Josiah Stryker, of Newark, N. J., and Virgil C. Kline, and Frederick Bachmann, both of New York City, of counsel), for defendants.

RELLSTAB, District Judge. The plaintiff is the owner, by assignment, of letters patent No. 1,569,942, issued January 19, 1926, on the application of Josephine M. Barnhill, and makes and sells the reversible hat covered by it, known and labeled by the trade-name "Betty B." The defendants Laurette Manufacturing Company (hereinafter called the Laurette Company) and Guaranteed Products, Inc. (hereinafter called the Products Company) are New Jersey corporations; and the defendants Eugene A. Tracey, Clyde E. Tracey, and Lauraene F. Hawk are stockholders thereof. The record fails to connect the last one named with any of the alleged wrongdoings, and she is excluded from the term "defendants" as hereinafter used. Clyde E. Tracey is the president and manager of the Laurette Company, which was organized to take over the business theretofore conducted by Eugene A. Tracey under the names of Laurette Manufacturing Company and Direct Sales Company.

Prior to the incorporation of these companies, the plaintiff and Eugene A. Tracey entered into a written contract, dated May 27, 1926, whereby the latter was given the exclusive sales right on Betty B hats in thirteen states, including New Jersey, for a period of one year. Under this contract the plaintiff furnished Tracey with Betty B hats and sales literature, and for some time thereafter he sold and distributed the hats in the allotted territory.

In July following, Tracey refused further to act under that contract, and by letter, dated July 12, 1926, notified plaintiff to that effect. Shortly thereafter the two defendant companies were incorporated.

The plaintiff charges the defendants with infringement and unfair competition.

They admit that, prior to September 15, 1926, the Products Company made, and together with the Laurette Company and Eugene A. Tracey sold, hats which infringed claims 1 and 2 of the patent in suit, if they are held to be valid. They deny that the hats made and sold by any of them after that date infringed any of the claims. They also admit that, prior to the filing of the bill (August 24, 1926), Eugene A. Tracey and these companies used sales material which constituted unfair competition. They deny any such wrongdoing after that date.

[1] As to the alleged infringement of the patent: The specifications of the patent state:

"This invention relates to hats and caps, and particularly to a convertible hat or cap, the general object of the invention being to provide a hat or cap which is capable of being reversed or turned inside out, and under these circumstances will be somewhat different from what it is when it is turned the other way, and which has a brim so constructed that it may be changed in many different ways to thereby secure various effects.

"A further object is to provide a hat with a brim of two colors, so arranged that the brim may be adjusted so as to show one

color on the exterior of the brim or another color on the interior of the brim as desired.

"A still further object is to provide a hat of this character which is readily adjustable to suit different sized heads." Page 1, lines 10–28.

All three claims are combination claims, and all are alleged to be infringed. They read:

"1. A hat having a crown of soft and flexible material and having a brim formed of two thicknesses of soft and flexible material of different colors, the hat being reversible to bring either face of the brim outside, the two thicknesses of the brim being unattached to each other except at the junction with the crown throughout nearly the entire extent of the brim to permit independent manipulation of these two thicknesses.

"2. A hat having a brim of soft and flexible material formed of two thicknesses of material free from attachment to each other except at the junction with the crown throughout nearly the entire extent of the brim, each thickness ending at its opposite ends in tabs adapted to overlap the opposed tabs, the brim at one end adjacent the base of one of the pairs of tabs being formed with a transversely extending slot through which the other pair of tabs may be inserted to thereby constitute the similitude of a bow.

"3. A hat having a crown of soft and flexible material formed of segmental sections stitched to each other from the center of the top of the crown downward to the margin thereof, the crown at one point in its margin having a V-shaped notch, the point of the V-shaped notch coinciding with one of the seams between two of the segmental portions of the crown, the brim of the hat opposite said notch being separated from the crown and being extended to form two tabs, the brim at its junction with one of said tabs being transversely slotted to permit the insertion therethrough of the other tab whereby the hat may be drawn up to change its size."

It is noted that the second claim omits the element of reversibility and the limitation to a brim "of different colors," and that it introduces the element of tabs at the opposite ends of the brims, with a transverse slot in one pair of tabs through which the other pair of tabs may be inserted to thereby constitute the similitude of a bow; also, that the third claim omits the elements of reversibility, the double brim free from attachment at their outer edges limits the crown to one of segmental sections, and introduces the element of a V-shaped notch in the

crown, the point thereof coinciding with one of the seams between two of the segmental portions of the crown, and states that, by the insertion of one of the tabs of the brim through the slot in the other tab, the hat may be drawn up to change its size.

In support of the defense of invalidity, the defendants introduced a number of patents. These have all been studied, but specific reference will be made to only one (Danubio, No. 1,504,100, issued August 5, 1924), as it is manifest that, if this is not anticipatory, none of the others can be. Most, if not all, of the elements of the plaintiff's claims are old. After considerable discussion with counsel at the hearing, I expressed the opinion that all these claims were valid. Further consideration has fortified that opinion.

One of the elements common to claims 1 and 2 is a brim formed of two thicknesses of soft and flexible material, free from attachment to each other except at the junction with the crown throughout nearly the entire extent of the brim. By means of this element, as declared in the patent specifications (page 1, lines 79–84), "it is possible to separately manipulate these brims so as to have, for instance, one brim turned up and the other brim turned down, and thus some very odd and interesting effects may be secured with the hat."

All plaintiff's original claims were rejected on Danubio, presently to be discussed in relation to claim 3, and this particular element was introduced into these claims and stressed as overcoming that patent and the other citations. After some minor amendments, the claims as above were allowed.

Plaintiff claims that the double brims, unattached at their outer edges, and the results secured by their separate manipulation, are novel. I am inclined to agree. However, whatever one might conclude as to this particular element, it is evident that the precise combination set out in both these claims, and the results secured thereby and described in the specifications, are not disclosed or taught in Danubio or any of the other citations leveled against these claims. These two claims were held valid and infringed by a decree dated July 15, 1926, without the rendering of a written opinion, in the suit brought by the plaintiff herein against a copartnership doing business as Sport Hat Company, in the United States District Court for the Northern District of Oklahoma. Claim 3, however, was not involved in that suit; the therein decreed infringing hat not embodying all the elements of that claim. Claims 1 and 2 are found patentably novel.

As to claim 3: The segmental sectional crown and the V-shaped notch in the margin of the crown are found only in this claim. Both are old, but the location of each in relation to the others permits functions and results which are not. With reference to their use, the specifications say:

"It is to be noted that the segmental sections from which the crown of the hat is formed provide a plurality of radially extending seams which, when the brim of the hat is contracted by the insertion of one tab through the slit 21, causes the crown of the hat to tend to fold on the line of these seams, thus doing away with any folding of the body of the crown which would seem to be accidental or would mar the symmetry of the hat. It will likewise be noted that the tabs have a width greater than the length of the slot 21, so that the tab must be folded in order to pass through this slot and expands after it is passed through the slot, as shown in figure 3, so that to some extent this tab is anchored within the slot and will not pull out and does not need any additional fastening device to prevent the hat from expanding under ordinary circumstances. Furthermore, by having the tabs free from attachment to the brim after one tab has been passed through the slot at the base of the other tab, the tabs will stand out in the similitude of butterfly bows and will not lie flat against the brim as they would have to do in case they were detachably engaged with the brim." Page 1, line 86 to line 11, p. 2.

"Furthermore, by forming the notch 14 as disclosed and having the tabs 16 and 18a passing through the slot 20, it is possible to contract the rim of the crown so as to make the hat fit small heads or to allow the rim of the crown to expand so that it will fit larger heads, and thus the hat is adjustable as to size." Page 2, lines 61–68.

"Furthermore, while under some circumstances, as stated above, it is desirable to have the brim formed of an outer portion and an inner portion, either of which can be displayed, I do not wish to be limited to this, as the brim might consist of merely one layer of material having a member at one end formed with an opening to receive the extended other end of the brim." Page 2, lines 86–94.

The patent to Danubio, the one most relied upon by the defendants, shows a notch in a hair protector composed "of net or other reticulated construction"; also tabs formed of the free ends of the band attached to the lower part of the net. The specifications of this patent state:

"The free ends 5 and 6 of the band are of sufficient length to overlap as illustrated in figure 4; one of said ends being provided with a slot 7 through which protrudes the other end, said ends being detachably fastened to the adjacent portion of the band by means of the snap fasteners 8. In order to provide for variations in the size of the band 2 several snap fasteners are provided on each side, to any of which the free ends 5 and 6 may be secured." Page 1, lines 96–107.

This hair protector "is adapted for either day or nighttime wear. Its particular function at nighttime is to hold the hair in the position in which it may have been brushed or combed prior to retiring." Page 2, lines 30–34. The use in the day time is particularly for "athletes or those who engage in strenuous games such as tennis or any work of violent character in which the hair is apt to fall into the eyes. The hair protector not only holds the hair in place, but the band serves as a sweatband, eliminating the discomfort of having perspiration running down into the eyes." Page 2, lines 56–63.

Danubio's improvement is not to a hat, but to a hair covering. It has no brim or its equivalent. The purpose he had in mind was one that could not be served by an ordinary hat or cap, and certainly not by one like the Betty B. True, it is a head covering, but solely to hold the hair in place. The function of a brim was foreign to his conception, and its presence would militate against the very gist of his improvement. The function of the free ends of the bands in conjunction with its slot and fasteners and the notch in the lower back part of the net is to secure a tight fit to the head below the hair. Without the fasteners, there could be no tight, or even snug, fit to the head. The fasteners are rigidly placed, and the adjustment to different sized heads could be accomplished only by having additional fasteners which would not effect any leeway between.

The Commissioner of Patents deemed that the claims as allowed overcame Danubio and the other citations. With his conclusion, I am in full accord.

The utility of the combination is not questioned. Indeed, the manufacture and marketing by the defendants of hats precisely the same as that covered by the plaintiff's patent, and the large numbers of the Betty B hats (about 200,000) sold throughout the country, are very persuasive evidence of the commercial usefulness of these hats.

The invention as circumscribed by the claims is a very narrow one, but, narrow as it is, it is entitled to the protection of the patent as granted. It follows that, so far as the hats made and sold by the defendants prior to September 15, 1926, are concerned, they constituted an infringement of all the claims.

Does the present hat of the defendants infringe? On and continuing from the last-mentioned date the defendants changed the character of their hat in certain particulars. The plaintiff concedes that the defendants' present hat as made does not constitute a direct infringement of claims 1 and 2. He contends, however, that it is an indirect infringement of these claims and a direct infringement of claim 3. Concededly the differences in the present hats of the defendants as compared with their former hats are: The stitching together of the two brims at their outer edges, the reinforcement of the slot in the tabs and of the V-shaped notch, and the nonperforation of the ends of the tabs. The reinforcement of the notch was not made until about six weeks after the restraint was issued in this case. The reinforcement of the slot and the omission of the perforations in the tabs are negligible on the questions of both infringement and unfair competition, and will not be given further mention.

As to direct infringement of claim 3: Defendants claim that the notch in their present hat is not in the crown. This is their main reliance to avoid infringement of this claim. The plaintiff asserts the contrary. This dispute is determinable by an inspection of the defendants' hats, and, as a double brim is not an element of claim 3, its determination will dispose of the question whether or not this claim is directly infringed.

Such an examination discloses a notch formed by leaving unsewed the lower parts of two of the segments of the crown adjacent to the beginning of the unslotted tab of the brim. The notch is at the same place designated in claim 3 and described in the specifications. Page 1, lines 52–55. When the hat is stretched, this notch takes on a V-shape. True, as stitched, the reinforced notch is restricted in its size and function, but a slight ripping or unstitching of the added pieces, where they join the seam of the segments of the crown referred to, would make the notch as large and as efficient in function as that of the plaintiff's hat. The form of the pieces added to make the reinforcement, and the manner of stitching them to the crown, make it very easy to enlarge the notch without detriment to the hat, and carries the suggestion that this capability to enlarge the size and function of the notch was not unknown to the defendants, or undesigned by them, when this form and method of reinforcement were adopted. However, without stressing this capability, and accepting the smaller size notch as the only one intended, it is obvious that the difference in the size or function of the notch of the defendants' hat is only a matter of degree, and infringement is not avoided thereby.

As now made, the defendants' hats constitute direct infringement of claim 3.

[2] Does this hat indirectly infringe claims 1 and 2? As noted, defendants' hat has its double brims sewed together at their outer edges. If this stitching were not present, the hat would possess all the characteristics of a Betty B hat, and directly infringe claims 1 and 2. Mere capability of being turned into an infringing hat, however, does not constitute infringement.

Since the issue was joined in this suit, the defendants' district managers, or persons in charge of two of their distributing agencies, ripped this stitching of four of the defendants' hats purchased by the plaintiff's representatives. One of these rippings was at the defendants' Akron office; the other three at their Pittsburgh office; two on one occasion and the other about a week later.

There is considerable doubt whether the suggestion to rip these brims came from the plaintiff's or the defendants' representatives, or whether the rippings were done willingly or under protest. No evidence connects any of the defendants with any of the rippings. Clyde E. Tracey, the president of the Laurette Company, denied knowledge thereof and that any brims of the defendants' hats were sewed with the intent that they should be ripped.

To my mind, these rippings must be treated as isolated instances, and not indicative of a practice by the defendants' representatives. If they were done by these representatives on their own initiative—concerning which I have considerable doubt—or were so willingly performed as to indicate a readiness to change the defendants' single brim hat into a double brim hat like the Betty B, to avoid losing a sale or to prevent the sale of a Betty B hat, they constituted an indirect or contributory infringement by such representatives, for which they could be held personally liable; however, they are too few to establish a trade practice from which might be drawn the inference that the defendants must have known of, or acquiesced in, it. On the record the

issue of indirect or contributory infringement must be determined against the plaintiff.

[3] As to unfair competition: Contrary to the impression made at the hearing, I have concluded that the defendants have been guilty of unfair commercial practices since the filing of the bill, and that the plaintiff is entitled to equitable relief against this form of wrongdoing. The hats made by both parties are not "dress" but "sport" hats. They are not adapted for sale by milliners. They are best sold by salesmen who go from house to house with samples soliciting orders, which is the method of selling by both parties. The price—$3.95—is the same for both hats, and the usual deliveries are made C. O. D. by parcel post from distributing agencies, located at convenient points. Personal demonstrations are made at different places, whereby the solicitors are instructed in the special distinguishing features of the hat and the various effects that may be produced through manipulation of the several elements of which they are comprised. Sales literature, illustrating and specializing the different features and advantages of the hats, is given to the salesmen and used by them in canvassing for orders.

In introducing the Betty B hat to the public, the plaintiff made large expenditures in advertising its features and advantages both before and after he entered into the contract with the defendant Eugene A. Tracey. During the continuance of the contract, and while Tracey was acting as the plaintiff's sales and distributing agent, and using the plaintiff's sales literature he was instructed by the plaintiff of the latter's sales methods and the character and use of his sales organization, and he had the benefit of the plaintiff's previous and continuing advertising. Some time while this contract was in force— and, as it was repudiated and abandoned by Tracey in less than two months after it was made, it must have been shortly after he entered upon the performance of it—he formed the purpose to divert the market for these hats from the plaintiff and appropriate it for his own benefit and those associated with him. In carrying out this purpose he brought about or aided in the organization of the two defendant companies, and thereupon all of the defendants made or sold hats almost facsimiles of the plaintiff's, and some were sold even after the injunction not so to do was issued by this court.

During the continuance of this contract, the plaintiff furnished Eugene A. Tracey with a large number of Betty B hats, approximately 22,000, some of which the defendants still hold. In the answer filed in this suit, the defendants admit that prior to the incorporation of the defendant companies Eugene A. Tracey purchased and sold "hats similar to the hats of the plaintiff in style, pattern, color, and details of construction, and that a few of such hats * * * bore a label with the words 'Better B.'" It denies that at the time they were sold he had "knowledge that they bore such label."

The answer also admits that "for a brief period" Tracey and the two defendant companies "used sales material of the character comprising Plaintiff's Exhibit D1, but allege that such sales material was not used with intent to appropriate and profit from any good will created by the plaintiff." Plaintiff's Exhibit D1, referred to in such admission, is the sales kit issued and used by the plaintiff, and is composed of charts, order forms, and various sales material, all bearing the name of the Betty B Company, and advertising and illustrating the several styles and colors of their hats.

This appropriation by defendants of the market created by the plaintiff and its agent Tracey for the Betty B hat, some of it admittedly after the restraint was issued in this suit, constituted a flagrant type of unfair competition, and seriously reflects upon the commercial methods used by the defendants. This background is to be kept in mind when the subsequent transactions and conduct of the defendants are considered, for here we are not considering alleged unfair commercial practices by defendants who had no previous contractual or business relations with the plaintiff. The sales literature used by the defendants since the filing of the bill differs from that issued and used by the plaintiff, and standing alone admittedly could not be held to constitute unfair competition. In conjunction with this differing sales literature, however, the defendants carried on the sales organizations and methods of securing trade that they had practiced theretofore, and which was the same as Tracey carried on while acting as agent for the plaintiff, and continued to use the same salesmen that they had theretofore used while the admitted infringement was practiced; some of them having also been employed when Tracey acted as the agent of the plaintiff.

In addition to the differences in the defendants' present hat, already noted, a label with the word "Laurette" printed thereon in script is sewed on the crown immediately adjoining one side of the notch, and is located between those ends of the tabs of the

brims where the transverse slot appears. This is the same location as where the Betty B label is placed. These labels are necessarily small, similar in size,, and obviously not intended to be seen when the hat is worn.

Even if these hats were laid beside one another, or were worn by persons in close proximity to each other, there would be nothing in their general appearance to suggest that they were different kinds of hats or made by different manufacturers. They would have to be handled and critically examined before the actual differences would be apparent. Such an examination of the defendants' hats would show the name "Laurette" and that their double brims were sewed together by one row of stitching at their outer edges. But it would not disclose who made them—the word "Laurette" not indicating the source of their manufacture. Only those knowing that hats of that style and character were made by different manufacturers would have any inkling that the hat was not one made by the plaintiff. While the outer edges of the brim remained sewed, a lesser number of, or differences in, effects would be secured by its manipulation than if these edges were free from attachment.

However, if the sewed outer edges of the brims of the defendants' hat should be ripped, all the varied effects that could be obtained by manipulation of the brims of the plaintiff's hat would be available. In dealing with this capability of the defendants' hat, under the head of contributory infringement, it was determined that the evidence was insufficient to establish that it was the practice of the defendants' representatives to rip or remove the stitches so as to make a double brim instead of a single one, and thus have it conform to the chief characteristic of the Betty B hat, or that the defendants in stitching its brims contemplated that such rippings should be made. Nevertheless, on the question of unfair competition, in view of the palpable purpose of the defendants to filch from the plaintiff some of the profits that presumably might be derived from the business built up by him, as aforesaid, this capability, and the ripping of the reinforcement of the notch in the crown, to permit of an enlarged area in the adjustment of the hat to different sized heads, cannot be treated as simply accidental and negligible. The ease with which the defendants' attached brims may be changed into double brims and the notch enlarged, thus making their hats like those of the plaintiff's in appearance as well as function, is both a constant temptation to the defendants' sales-people to unfairly compete with the plaintiff, and a continuing menace to his patent protected and other commercial rights.

The putting of the defendants' hats, as now constructed, into competition with those of the plaintiff, without more persuasive marks indicating their source, is bound to bring about confusion among buyers, with resultant injury to the plaintiff. The plaintiff was the first in the field. By and through the expenditure of his money in advertising the features and advantages of his hat, and by his method of bringing them directly to the attention of the buying public, carried forward in part by the defendant Eugene A. Tracey while he was acting as plaintiff's agent, the plaintiff secured certain commercial rights in the marketing of these hats which it would be inequitable to permit the defendants to wrongfully divert to their own advantage. The defendants are not to be denied absolutely the right to make and sell a reversible hat in competition with the plaintiff. However, they may neither infringe his patent nor so closely imitate his hat as to mislead the buying public into accepting their hat under the belief that it is the Betty B hat.

[4] The line of demarcation between fair and unfair competition is seldom easy to draw. Subtlety rather than openness characterizes the encroachment upon the rights of a competitor legally in possession of the market. The particular facts, rather than attempted legal definitions, must control. In the instant case the only material change made by the defendants in their hat from that admittedly an infringement of the plaintiff's patent is the sewing together of the two thicknesses of its brims along their outer edges; but this had been performed in a manner easily undone. This change was deemed sufficient to escape infringing claims 1 and 2 of the patent which are limited to a double brim hat, but it is not so marked a change as to distinguish the defendants' hat from the plaintiff's, to the ignorant and unwary, a not unimportant factor in determining the charge of unfair competition.

While there is not sufficient evidence that any prospective customer for a Betty B hat has been induced by ripping the brims to buy defendants' hat, or that any particular person has bought a Laurette hat under the impression that it was a Betty B, yet such actualities are ever in the offing so long as defendants are permitted to sell their hats as now constructed, without carrying therewith such distinguishing marks as to clearly

indicate that they, and not the Betty B Hat Company, are the makers thereof.

[5] This failure to show a specific instance of such confusion or deception, or that the defendants' salesmen have ripped the brims to produce a double brim hat, or ripped the reinforced notch to enlarge its scope, or suggested that such rippings would produce the effects of the Betty B hat, may be due to the inability thus far to discover them, because of the short time that has intervened between the marketing of the defendants' present hat and the taking of the proof on the final hearing hereof. However, in the circumstances, this failure is not controlling. The record shows that the defendants, by their conduct when the bill was filed, were not to be trusted to compete fairly. It justifies the finding that they purposed to disregard the plaintiff's patent and to secure for themselves a market created by his means, industry, and skill. Their subsequent changes in the hat suggest a purpose of evading, rather than avoiding, his patented hat.

Except in one particular, these changes are found to be colorable and not material. The effect of this one, while deemed substantial enough to avoid infringing two of the claims, does not so change the appearance of their hat as to distinguish it from the plaintiff's, unless critically examined and tested. In such circumstances, it is deemed that a confusion and deception are both natural and probable results, and that the plaintiff is entitled to the protection of a court of equity against such consequences, without proving specific purchases made of defendants' hats under the belief that they were those of the plaintiff.

In view of the defendants' previous flagrant unfair competition (stopped in part only by the restraint issued in this case), whereby they sought to wrest from the plaintiff the fruits of a business protected by a patent and built up exclusively by his money and skilled sales organization and advertisements, their failure to so clearly mark their present imitative hat that the ordinarily attentive purchaser would not be deceived into buying it, believing it to be a Betty B hat, must be held to constitute unfair competition.

If the defendants desire to honestly compete with the plaintiff, as a change in or elimination of some feature of their present hat, and which apparently is nonessential to it, or the use of different methods in marketing it, or more prominent or significant ways of indicating its source of manufacture, may so distinguish the defendants' hat as to avoid its being confused with the Betty B hat, the defendants may still, under prescribed terms and limitations, continue to make and vend a reversible hat in competition with the plaintiff. Under proper restrictions the commercial rights of both parties may be protected; the plaintiff in not having his hats displaced by the defendants' hats under the supposition that they are of his manufacture, and the defendants in the marketing of reversible hats on their own merits, if not an infringement of plaintiff's patent, accompanied with sufficient notice that they are of their own, and not of the plaintiff's manufacture. Either counsel, on notice to the other, may bring on the settlement of these terms and limitations on a regular motion day to be held in Trenton.

A decree may be entered in conformity with this opinion.