**BEATTIE MFG. CO. et al. v. TUTELMAN–KOHN–MARCUS, Inc.**

No. 1073.

District Court, D. Delaware.

March 25, 1937.

John J. Darby and C. Willard Hayes (of Cushman, Darby & Cushman) both of Washington, D. C., and James M. Malloy, of Wilmington, Del., for plaintiffs.

Augustus B. Stoughton and E. S. W. Farnum, Jr., both of Philadelphia, Pa., and Francis A. Reardon, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a patent infringement suit.

Plaintiff, the Beattie Manufacturing Company is a manufacturer of machinery used in the shirt and collar industry. Plaintiff, Cluett, Peabody & Co., Inc., manufactures collars, shirts, and other articles of apparel.

The patents in suit are McAuley, Nos. 1,910,848 and 1,910,849, granted May 23, 1933, and Beattie, Nos. 1,896,934 and Reissue 18,732, granted February 7, 1933. Cluett, Peabody & Co., Inc., owns the McAuley patents and has granted an exclusive license thereunder to Beattie Manufacturing Company. Beattie Manufacturing Company owns the Beattie patents.

The bill charges the defendant with using collar pointing machines purchased from Automatic Forming Die Corporation, the company conducting the defense of this suit. The bill further charges that these machines embodied the patents above recited. The answer sets up the defenses of invalidity of all the patents and noninfringement of the Beattie patents.

The patents in suit relate to the manufacture of soft collars usually attached to the neckbands of shirts. They are made from three plies of material cut to the

proper size consisting of two facing plies with a heavier interliner positioned initially on the outside. The plies are stitched together by a marginal line of stitching known as a "run stitch" extending along one longitudinal edge and the two transverse edges. The transverse and longitudinal lines of stitching meet at an acute angle where the points of the collar are formed. The collar is turned inside out by hand so that the facing plies are on the outside with the interliner between. The turning operation conceals the "run stitch" and positions the marginal area of material between the run stitch and the free edges of the plies. After this turning operation, a second marginal line of stitching known as the "top stitch" is run along the longitudinal and transverse edges. The turning operation results in the accumulation of a substantial surplus of material at the collar points. This surplus tends to make the points bulky, blunt and irregular.

Attempts had been made to improve the appearance of collar points by cutting away the point of the interliner, by trimming the facing plies adjacent the point and by distributing the surplus by small hand tools. Satisfactory results were not obtained. The surplus material was seldom uniformly distributed. It had been the practice to iron the collars as a final operation before shipment. This did not improve the appearance of the points but tended to flatten them out into bulbous points known in the trade as "knobs." These knobs resulted in many "rejects" and in the classification of many shirts as "seconds." Moreover the surplus at the points were often scorched in the final ironing so that the collars were unsalable. The collar points are the first things a buyer examines. A real problem existed in the art. McAuley and Beattie solved the problem by the methods and machines of the patents in suit. Thus a soft collar having flat and uniform points was produced.

The first McAuley patent claims a method of shaping the points of soft collars and the collar resulting from the method. The second McAuley patent is directed to the machine for practicing the method of the first patent. McAuley provides a heated bed plate having side walls formed by a matrix plate positioned above the bed. These walls are disposed in V-shape relation to each other and correspond to the edges of the collar to be shaped at the points. A plunger has a pressing surface at its lower end adapted to fit closely the space between the upstanding side walls. The McAuley method consists in shaping the edges of a collar point by subjecting the top and bottom surfaces of the collar adjacent to the point to heat and pressure while confining the edge faces to the desired contour by rigid abutting walls under the influence of the pressure applied to the surfaces. The heat and pressure applied to the surfaces not only press and smooth those surfaces but also impart definite contours or shapes to the edge faces. The McAuley method of shaping a collar point is performed after the collar has been "run stitched," turned and "top stitched." As a result a new product is produced, i. e., a collar having the excess material in the points confined so that the edges are substantially of the same thickness as other portions of the collar and are straight.

The Beattie patents disclose and claim a method and an apparatus for shaping the points of collars. They are improvements on the McAuley patents. Beattie shapes the points after the collar has been "run stitched" and turned but before the "top stitching" has been applied. Beattie shapes the points by externally and internally confining the points during the application of heat and pressure to the surfaces. Beattie uses an internal die which is inserted between the plies of the turned collar in combination with external confining walls. Means for applying heat and pressure to the surfaces of the collar on the internal die are provided. The internal die is of the size and shape desired in the finished collar point. The internal die serves as a means for positioning the collar point within the external die. The edges of the collar are thus confined between the edges of the internal die and the walls of the external die while heat and pressure are applied to the surface of the collar point so confined. After the shaping operation so the "top stitching" is run along the edges of the shaped point thereby anchoring the surplus material in the position to which it has been distributed by the shaping operation.

The machine used by defendant was manufactured by Automatic Forming Die Corporation under a license from Maurice L. Kaplan, the patentee. There is provided in defendant's machine an external die having a bed plate and upstanding side

walls corresponding to ·the edges of the points of the collar. The external forming die is secured to a carriage mounted on the frame for movement into and out of the external die. A treadle depresses the head to apply heat and pressure to the collar points. Defendant's machine comprises two internal dies and two external dies, one for the right-hand collar point and the other for the left. The collar points are placed on the internal dies after the blank has been "run stitched" and hand turned, but before it has been "top stitched," exactly as in Beattie. The internal die with the collar is forced snugly into the external die so that the edges of the collar point are pressed between the edges of the internal die and the upstanding walls of the external die. The head is then depressed to apply heat and pressure to the top and bottom surfaces of the collar point. At the same time the edge surfaces are shaped by the confining action of the internal and external dies.

January 28, 1931, Beattie left two of his forming machines on trial at the plant of the Shirtcraft Company under the care of Kaplan, its vice president. January 29, 1931, Kaplan wrote to Beattie and suggested making two additional machines to work on the left-hand points of collars. Before the additional machines were made Kaplan wrote that his company did not care to buy the machines left on trial. May 7, 1931, Kaplan wrote to Beattie stating that he had developed a new machine. This machine is disclosed in Kaplan patent, No. 1,902,330. Application therefor was filed April 25, 1931, three months· after Beattie had left the two machines in Kaplan's plant. Although the Beattie patent applications had been filed months before Kaplan filed his application· an interference proceeding between Beattie and Kaplan was declared in the Patent Office. All of this was after Beattie's disclosure to Kaplan. After the interference was declared, Kaplan took no steps to prove priority, and judgment was rendered in favor of Beattie.

In McAuley's method patent plaintiff relies on claims 14 and 15 of which 15 is typical. Plaintiff also relies on claim 18 covering the product.

. "15. In the manufacture of soft collars of the type having a fold-over top, the improved method which consists in externally confining the edges at the points to a predetermined shape, and while confined applying heat and pressure to the surface of the collar point within the confined area."

Each of the steps in this claim is employed by defendant. The plies forming the top are stitched together and turned inside out. The points are then shaped by externally confining the edges and while they are being shaped heat and pressure are applied to the surfaces of the collar points within the confined area. These operations are performed by an external die and by the pressing pad forming the top of the die.

Claim 18 is directed to the collar produced by the McAuley method: "18. A textile product such as a collar having the top portion comprised of cloth plies edge-turned, and having the excess material in the points condensed to a substantially uniform thickness substantially the same as that of other edge portions of the collar top so that the opposite surfaces of each point lie in substantially parallel planes, the edges of the points extending from the surface forming the outer face side of the collar point toward the under side thereof along lines which are straight in a direction transversely of these edges so that the latter are substantially free from edge convexity and meet the outer face side of the collar point along lines which are relatively sharp and well defined."

Defendant's collar produced by defendant's machine and by defendant's method is a hand-turned collar comprising cloth plies edge-turned. The excess material in the points is compressed by the external die to a substantially uniform thickness so that the opposite surfaces of each point lie in parallel planes. The top and bottom surfaces are compressed between top and bottom dies so that the collar at the points is of the same thickness as elsewhere.

Claim 12 of the McAuley machine patent is the only one relied upon.

"12. In a garment point forming machine, walls spaced apart and forming therebetween a recess adapted to closely follow in substantially abutting relation the edges of a garment point positioned therein and confine the same to a predetermined shape, said recess having a bottom surface disposed in a plane from which said walls extend at an angle whereby the walls meet said surface and may abut the edges of and confine a garment

point positioned on said bottom surface, and means for applying heat and pressure to a garment point within said recess."

Defendant's machine comprises walls forming a recess and adapted to follow the edges of a collar point to confine the edges to a predetermined shape. The machine also comprises a bottom surface in a plane from which the side walls extend at an angle. This is the bed plate. Means for applying heat and pressure to the garment point in the recess are the heating unit disposed below the bed plate and the pressing pad above the recess.

In the Beattie method patent three claims are invoked of which claim 17 is typical. These claims are directed to a method of shaping a point by internally and externally confining the edges during the application of heat and pressure.

"17. In the manufacture of soft collars of the type having a multiple ply fold-over top, the improvement which consists in superimposing the several plies forming the top, stitching the same together along one longitudinal and the transverse edges while leaving open the other longitudinal edge which is to be secured to the band, turning the top inside out, thereby inturning the stitched edges and concealing the stitching, internally shaping the points, externally shaping the points and while the latter are being shaped applying heat and pressure, the pressure being applied against the surfaces and edges of the collar, and thereafter running a second line of exposed stitching along said longitudinal and transverse edges."

In the manufacture of defendant's collars the several plies forming the top are first superimposed and then stitched together along one longitudinal edge and two transverse edges by the "run stitch." The blank is then turned inside out by hand. The points are internally shaped by an internal forming die. The points are externally shaped by the upstanding side walls of an external die and by the bed plate and the pressing head. While the points are within the external die and are being shaped, heat and pressure are applied by the heated bed and the movable pressure head. In defendant's method, a line of exposed stitching is run around the edges of the blank after the shaping operation. All of the steps of this claim are used in defendant's manufacturing operation regardless of whether the internal die is in or out of the external die when heat and pressure are applied.

In Beattie's machine patent three claims are in suit of which claim 25 is typical. This patent covers the Beattie machine comprising an internal plate die, an external forming die and means for applying heat and pressure.

"25. In a garment point forming machine, walls spaced apart and forming therebetween a recess adapted to closely follow in substantially abutting relation the edges of a garment point positioned therein and confine the same to a predetermined shape, said recess having a bottom surface disposed in a plane from which said walls extend at an angle whereby the walls may abut the edges of and confine a garment point positioned on said bottom surface, means for positioning a garment point in said recess, said means comprising a die adapted to fit between the plies of a garment point and having edges closely following the edges of a garment point, whereby to confine the garment point edges between the edges of the die and the recess walls, and means for applying heat and pressure to a garment point within said recess."

In defendant's machine the side walls of the external die form a recess. There is a bed plate from which the side walls extend upwardly at an angle. The internal die is a means for positioning the collar point in the recess. The internal die is adapted to fit between the plies of the collar point so that the point may be confined between the edges of the die and the recess walls. There is also the heating element and the pressing head.

When the claims in suit are compared with defendant's machine, method, and product, the defense of noninfringement is seen to be untenable.

Defendant's machine was designed by Kaplan after he had tested two Beattie machines. Kaplan copied the principles and structural features of the Beattie machine. The claims of the patents under which the Beattie machine was made cover the Kaplan copy.

Defendant attacks the validity of the patents in suit on the broad ground that the patents do not embody invention but mere mechanical skill. Defendant contends that no invention was required to design the machines or to conceive the methods of the patents in suit, in view of the

118

old art of molding articles out of plastic material. Defendant also relies upon five prior patents taken from the field of apparel apparatus.

The molding of plastics, such as paper pulp and molten metal, is not analogous to the art of making articles of clothing out of woven textiles. The materials worked upon in the two arts have widely different characteristics. It would not be reasonable to expect any one to utilize the principles of the plastic molding art for the manufacture of articles from woven textile fabrics. The different characteristics of the materials would suggest that molding operations could have no value when applied to woven textile products. The molding of plastics is based upon the fluidity of the material when subjected to heat and pressure. This fluidity enables the material to flow into and to follow the form of the molding dies. Woven textile material has never been considered a plastic. Such textiles are not fluid under heat and pressure. To use in the manufacture of textile products, implements which the prior art had designed for use with plastics is not obvious. The anchored relation of the threads of a textile would suggest that a material would not be capable of receiving a set from a molding operation.

█ Clearly, it was invention to conceive that a woven material having stitched folded edges could have those edges molded or shaped in a die under the application of heat and pressure to the surfaces. McAuley by confining, during the ironing operation, the edge surfaces of a textile product obtains an additional function. The surface pressing due to the confining walls imparts a set to the edges. Beattie goes a step further by adding the internal die and improves the results obtained by McAuley.

█ Beattie and McAuley did more than take old molding machines and apply them to the textile field. Changes in the mechanical elements and method steps were necessary. In molding plastics the accepted practice is to confine the molten material on all sides. If it were not so confined the material would flow out of the die. Beattie and McAuley changed the conventional die structure. By eliminating one side wall of the external die an entrance was afforded for the collar point. When in transferring a device from one art to another it becomes necessary to make changes in the device to enable it to perform a new function, invention may be present in the adaptation.

The transposition of an idea old in one art to a nonanalogous art has been discussed by the Supreme Court.

"Indeed, it often requires as acute a perception of the relations between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before." C. & A. Potts & Co. v. Creager, 155 U.S. 597, 607, 15 S.Ct. 194, 198, 39 L.Ed. 275.

"And usually it may be taken as true that the observation and the imagination of the inventor are required to make adaptations from one art to another. C. & A. Potts & Co. v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; Wold v. Thayer & Chandler, 148 F. 227, 78 C.C.A. 350. When one has conceived a new entity he may go where he pleases for his materials with which to give it a body." Foster v. T. L. Smith Co., 244 F. 946, 952 (C.C.A.7).

Defendant cites 56 patents in its answer but relies upon 5.[1] Defendant contends that the patents in suit do not embody invention over the prior art. None of the prior patents shows means for confining the edges of a collar point to a predetermined shape during the application of heat and pressure to the surfaces of the collar point. None shows an internal die adapted to internally shaping points of a collar in combination with external means for externally confining the edges of collar points during the application of heat and pressure to the surfaces. A brief

---

[1] Wheeler No. 1,305,510, June 3, 1919; Zimmerman No. 1,313,777, August 19, 1919; Carroll No. 1,560,758, November 10, 1925; Bartholomew No. 904,398, November 17, 1908; and Osborne No. 808,473, December 26, 1905.

consideration of the five patents relied on by defendant will show that Beattie and McAuley inventions are new.

. The Wheeler patent shows in 31 sheets of drawings and 21 pages of specification a complicated machine for making cuffs. Defendant relies upon only one minor mechanism in the machine. This mechanism does not shape the edges of the cuff nor confine the edges during the application of heat and pressure to the surfaces. The edges are entirely free and unconfined during the surface pressing or ironing. The Wheeler patent bears no resemblance to the machines of the patents in suit. It functions in an entirely different manner and employs a different sequence of steps. The relation of confining walls for the edges during the application of heat and pressure to the surfaces is entirely lacking in Wheeler.

The patent to Zimmerman is directed to a collar or cuff turning mechanism. The operation is similar to "hand turning." After the turning operation the action is similar to the drawing of a folded piece of fabric between the operator's thumb and forefinger to form a crease. There is no confining of the edges during the application of heat and pressure to the surfaces.

The Carroll patent relates to an ironing machine in a laundering operation to round off the upper edge of a turned down, stiff collar. It has no relation to a manufacturing operation and could not possibly be used to shape the points.

The Bartholomew patent also discloses an ironing apparatus in a laundering operation. It is not designed for the manufacture of collars. The edges of the collar points are totally unconfined.

The Osborne patent relates to a device in the manufacture of celluloid collars for imparting to its surface the appearance of a linen collar. No external die walls are provided for the purpose of confining the edges of a collar point. The edge surfaces of the celluloid blank are not shaped in any way.

The Kaplan patent discloses a machine for stretching collar blanks to a proper size. The machine is not intended or adapted to shape the points of a collar. Its sole use is to correct the size of collar blanks.

Maurice L. Kaplan testified that in 1927 he built and experimented with a device embodying plaintiffs' inventions. He is the licensor of defendant's machine and receives royalties for each machine sold. He did not explain how he fixed the date in 1927. Voigt, an officer and stockholder of the company manufacturing defendant's machine, also failed to explain how he fixed the date in 1927. The testimony of these witnesses given 9 years after the event and unsupported by any documentary corroborative evidence fails to prove the existence of the device on the dates alleged.

However, this Kaplan device can have no effect on the validity of the patents in suit. It was not offered as a technical prior use. It is a mere experimental device that was abandoned. Kaplan testified that the device was never put into commercial use but was "only for private use" and that he took the device off the stretching machine and put it away in his office where he had been keeping it ever since. From 1927 until April, 1931, Kaplan did nothing with the device. In January, 1931, he tested two Beattie machines in his plant. It is clear that he was inspired by the Beattie Machine and resurrected the old device which he had discarded.

"If it had been a success, he would hardly have thrown it aside permanently. Doubtless he did use a rigid extension of some sort; but if he ever used a pivoted device at all—of which we have considerable doubt—his efforts in that direction must be relegated to the class of unsuccessful and abandoned experiments, which, as we have repeatedly held, do not affect the validity of a subsequent patent. Corn Planter Patent, 23 Wall. 181, 211 [23 L. Ed. 161]; Coffin v. Ogden, 18 Wall. 120, 124 [21 L.Ed. 821]." Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 124, 39 L.Ed. 153.

"A prior invention, abandoned, is merely an experiment, and does not affect the rights of another inventor, who takes up the subject and perfects the invention for actual use. Whiteley v. Swayne, 7 Wall. 685, 19 L.Ed. 199." American Metal Cap Co. v. Anchor Cap & Closure Corporation (D.C.) 278 F. 670, 672.

Counsel for defendant has disclaimed any attempt to rely on this device as anticipatory prior public use. It cannot be used as showing the state of the art because it was a private, not a public, use.

Plaintiffs' patented machines and methods have gone into universal use in the collar industry. The commercial acceptance of the inventions emphasizes the validity of plaintiffs' patents.

The patents in suit are valid. The charge of infringement has been sustained. The plaintiffs are entitled to a decree, with injunction and accounting.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.