269 F.2d 255
 AMERICAN SAFETY TABLE COMPANY, Inc., Plaintiff-Appellant-Appellee,
v.
Joseph SCHREIBER and David Goldberg, Individually and as Partners Trading as Schreiber & Goldberg, Defendants-Appellees-Appellants.
AMERICAN SAFETY TABLE COMPANY, Inc., Plaintiff-Appellee,
v.
Joseph SCHREIBER and David Goldberg, Individually and as Partners Trading as Schreiber & Goldberg, Defendants-Appellants.
 No. 16.
 No. 17.
 Docket 24959.
 Docket 24960.
 United States Court of Appeals Second Circuit.
 Argued October 9, 1958.
 Decided June 19, 1959.
 Rehearing Denied in No. 16, Docket 24959 August 26, 1959.
 
 COPYRIGHT MATERIAL OMITTED Leon Edelson, Philadelphia, Pa. (Keith, Bolger, Isner & Byrne, Paul S. Bolger, New York City, on the brief), for plaintiff-appellant-appellee and plaintiff-appellee.
 Charles Sonnenreich, New York City, for defendants-appellees-appellants and defendants-appellants.
 Before CLARK, Chief Judge, and MEDINA and LUMBARD, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 These are cross-appeals in two companion cases involving questions of patent validity and infringement with reference to two of plaintiff's patents and a charge of unfair competition. The cases were tried together, but separate judgments were entered. Both patents were held valid and infringed, plaintiff was awarded counsel fees in the suit on the second patent, under 35 U.S.C. § 285, and the unfair competition charge was dismissed, but solely on the ground that, in the opinion of the trial judge, plaintiff's machines had not "acquired a secondary significance in the shirt-manufacturing trade and among users of such machines."
 
 
 2
 The trial was a long one and we are confronted with a formidable transcript of testimony and many exhibits, but we have not the advantage of an opinion or detailed findings to guide us through the maze of direct and collateral issues; and we would have sent the case back for adequate and specific findings but for the prospect of further inordinate delay.
 
 
 3
 Since the questions involved are complex we have decided first to set forth a relatively brief chronological description of the development of the controversy between the parties and the background of prior art, and then later to elaborate upon certain groupings of facts as each separate principal issue is discussed and legal principles applied to its solution.
 
 
 4
 Both plaintiff American Safety Table Company, Inc. (Amco), a Pennsylvania corporation, and defendants, Schreiber & Goldberg, a New York partnership, are engaged in the manufacture and sale of various machines used in the garment industry; both deal in and make collar shaping and pressing machines. These machines are useful in the shirt manufacturing industry, particularly with respect to soft, multi-ply collars at a stage preliminary to sewing them permanently to the neck-bands of the shirts. Both use a process which involves externally confining the edges of the collar point within a recess formed by specially designed dies, positioning the collar point within the external dies by means of a retractable internal die and then applying heat and pressure to the surface of the collar point within the confined area. Both mount their die assemblies on an inclined table and rely on foot-pedal actuation for exerting pressure and inserting the internal die.
 
 
 5
 The story of the development of these machines dates back to the late 1920's. It is customary in manufacturing collars to stitch plies of material together with an interliner forming an outer ply and to turn the plies inside out to bring the interliner between the plies. The plies are then moulded and pressed into shape. For a long time these various functions were all performed by hand. It was noticed that these methods not only were time consuming but that they produced undesired results, particularly with respect to the soft collars attached to shirts, in that bulges or lumps formed owing to the large amount of material that had to be turned into the points of the collar. The increased thickness at a collar point is attributable to the bunching of the surplus material at the plies which are necessarily double in number in this region. This bunching gave the collars an undesired convexity which detracted from their intended well-defined shape. Since the collar plays a highly important role in the appearance and saleability of the shirt, this drawback began to attract considerable attention.
 
 
 6
 Various attempts were made to improve the appearance of the collar points by cutting away the point of the interliner, by trimming the facing plies adjacent to the point, and by distributing the surplus by small hand tools.[1] But the surplus material was seldom uniformly distributed and these clumped points or "knobs" still resulted. Many shirts were accordingly rejected or classified as "seconds" on that account.
 
 
 7
 One of the earliest mechanical attempts to solve the problem was devised by an inventor named Morris L. Kaplan for a shirt manufacturing company. In 1926 he conceived a device which attempted to eliminate the bulkiness by stretching the collar. This machine had two oppositely movable pointed die blades which respectively received the opposite points of the collar; by forcing the blades apart, the collar was stretched. This effort, however, proved completely ineffectual, although a patent (No. 1,619,939) was granted on March 8, 1927. Amco's chief engineer and the inventor of the machines described in the patents now in issue, Max T. Voigt, was shown this device but he manifested little interest in it.
 
 
 8
 Later in 1927 Kaplan attempted to improve his machine by associating with each of the die blades a spring-pressed pressing die heated by an electric iron attached to its side. This effort also proved impracticable for various reasons, one of which was that it was too slow, for the collar first had to be stretched and then pressed, one point at a time. By April 1931 Kaplan had evolved a double point machine to speed up the process, using spring-pressed cross bars to apply the pressure from above. His internal die was shuttled into a recessed die by means of a carriage actuated by a pedal. Patent No. 1,902,330 was granted on this device on March 21, 1933.
 
 
 9
 Meanwhile, others were trying to solve the same problem by a variety of different means and devices. On June 21, 1930 Samuel J. McAuley filed application for patents on what proved to be the revolutionary step in the industry. It is he who is credited with being the first to pursue the idea that the application of heat and pressure to a collar within a confined area would distribute the interliner equally throughout the collar. McAuley's machine had a heated bed plate having side walls formed by a matrix plate positioned above the bed. The walls formed a "V" to correspond to the edges of the collar to be shaped. Pressure was exerted by a spring-controlled plunger and was adapted to fit closely the space between the upstanding side walls. The result was not only to press and smooth the surfaces of the collar but also to impart a definite shape to the edge faces. McAuley's patent No. 1,910,849 was issued on May 23, 1933; but it was a crude beginning and without further development it did not offer any practical solution to the problem confronting the industry.
 
 
 10
 Shortly after McAuley's discovery, on August 11, 1930, an improvement patent was sought by Walter J. Beattie. Still using a single point machine, he demonstrated the value of an internal die — also adopted by Kaplan — to position the collar. He used a retractable die blade, which was inserted between the plies of the turned collar. Unlike Kaplan's retractable die the blade apparently remained within the collar in the pressing recess at the time pressure was applied. The internal blade combined with the external continuing walls to give the collars their shape. A carriage arrangement was used to carry the internal die into the recess. While a pedal actuated the pressure, the carriage had to be manipulated by hand to insert the internal die blade into the pressing recess. This patent, No. 1,896,934, was granted February 7, 1933. All serious conflict between the McAuley and Beattie patents was avoided by a cross-licensing agreement. The Beattie Manufacturing Company was created and the Beattie-McAuley machine was first marketed around 1929 or 1930 and, as it had obvious advantages over the old hand method, it was used by many shirt manufacturers and obtained a certain popularity.
 
 
 11
 Another machine was designed by Edward V. McTague in 1932. It applied pressure and heat by means of cylindrical plates and contained a special recess for the part of the collar containing the extra material. The two cylindrical plates were connected by a link which insured a parallel relation between the plates at the starting point to facilitate the insertion and removal of the fabric into and out of the pressure area. Pressure was actuated by a foot pedal. It also had a single point internal die and its die assembly was mounted on an inclined table. A patent (No. 1,890,882) was granted on this machine on December 13, 1932; but this machine, for reasons that are obvious upon an examination of the face of the patent, was never in commercial use. Indeed, the only collar forming and pressing machines that became commercially available prior to 1952 were the McAuley-Beattie machines and the Amcos which we shall describe shortly.
 
 
 12
 In 1931 Kaplan showed Voigt and Amco's president, Louis Frankel, his double point spring-pressed machine and a license agreement was executed contemplating the promotion of Kaplan's invention. Plaintiff then formed a special subsidiary corporation for this purpose called the Automatic Forming Die Corporation. About 100 of the Kaplan machines were manufactured but these had to be withdrawn or scrapped because they failed adequately to accomplish their purpose.
 
 
 13
 Voigt, despite the failure of the Kaplan machine, and solely for the benefit of Amco, pursued continuing experiments in his effort to produce a machine that would meet the demands of the industry and overcome the defects that already were apparent in the McAuley-Beattie machines. He finally succeeded. Additional pressure was provided by a Y-Yoke, pedal actuated, that was clamped to the pressing shoes. The pressure of the Y-Yoke was directed by shafts and pivots, secured to the shoes by a clevis arrangement. An ingenious double pivot arrangement and clamps or springs to keep the pressing shoes level were found by the Patent Office to constitute patentable improvement over the prior art and, application having been filed on July 19, 1934, the patent No. 2,090,318, the first patent in issue here, was granted on August 17, 1937. The primary bases for Amco's claim of invention lie in the double pivot arrangement, the assembly or bracket of one pivot being anchored on the upper pressure shoes and the assembly or bracket of the other pivot being anchored on the pressure bed, thus harnessing the pressure of the Y-Yoke to the entire pressure area, and a pair of leaf-springs restraining the motion of the upper die away from the lower die or bed plate as "said upper die reciprocates toward and away from said lower die, and with a limited motion, toward and away from the point of said recess." The significance of these features is that they insure the application of level pressure to the collar points, since the upper and lower dies are first brought into parallel planes by the leaf-springs and then maintained in such relationship during the process of applying pressure by the double pivot setup.
 
 
 14
 When the first Voigt machine was put out by Amco some time in 1933, through its subsidiary Automatic Forming Die Corporation, the Beattie-McAuley interests, including Cluett, Peabody & Co., immediately sued one of Amco's customers for patent infringement in Delaware and Amco defended the suit. In retrospect it is easy to perceive what the outcome would be. Despite ill-placed reliance on Kaplan as the inventor of the main idea prior to McAuley, Amco lost the case and Judge Nields, presiding in the United States District Court of Delaware, held that McAuley and Beattie, not Kaplan, had originated the patentable ideas disclosed in their patents and that the Amco machine infringed. See Beattie Mfg. Co. v. Tutelman-Kohn-Marcus, Inc., supra, footnote 1. Once the question of who invented the basic idea of the effect of applying heat and pressure in a confined area was out of the way, the infringement by the Amco machine became obvious, as Voigt's invention was merely, and on the face of patent No. 2,090,318, an improvement patent, and as such could not lawfully be used without license from the owners of the prior underlying patents. And so, after another suit had been started in Pennsylvania, Amco, having taken an assignment from Kaplan, composed its differences with the Beattie-McAuley interests; certain moneys were paid over and a royalty licensing agreement was entered into by the terms of which Amco was permitted by the Beattie-McAuley interests to manufacture its new machines. Each of the contracting parties agreed that it would stick to its own distinctive pattern of machine and not impinge upon the distinguishing characteristics of the other's machine. This was of great importance as the two machines differed in appearance and in method of operation. One could not possibly be confused with the other. Doubtless Beattie had confidence in the ability of his relatively slow, single point upright machines; but this confidence was misplaced, as the Amco machines soon spread-eagled the entire industry, except for the few manufacturers who had not replaced their old Beattie machines. The Beattie machine became obsolete. By 1942 "very few" Beattie machines were being sold and since 1951 none at all have been sold. At the time of trial 80% of the nation's shirt manufacturers making 95% of the nation's shirts used Amco machines.
 
 
 15
 The advantages of the Voigt double point collar-presser over the Beattie single point machine include not only its simplicity and the greater speed made possible thereby, but the manufacture of a more uniform product, in the words of the patent, "a more rapid and accurate finish." The double point die blades are complementally shaped to receive opposite pointed end portions of the turned collar so that both of the end portions may be pressed simultaneously without reversing them top from bottom as was necessary with the Beattie machine. This means that both sides of the collar receive a uniform sheen from the double point pressing, a result only haphazardly obtained from single point pressing. In addition, the Voigt machine produces a smoother product and its pedal actuated internal die-blade makes it safer to use since it is not necessary for the operator's fingers to come near the heated pressure area.
 
 
 16
 Schreiber & Goldberg attempt to minimize this overwhelming commercial success of the Amco machine by referring to: the undoubted fact that Amco had no patent on the double point idea, which was evidently in the public domain, and had at least been used by Kaplan in his 1931 device; the fact that no use could have been made of Voigt's machine by Amco without license from the McAuley-Beattie interests; and the lack of competition from other sources. This is the familiar talk of an infringer; and it comes with the less grace from an infringer who has paid the device the most sincere of all compliments by copying it root and branch. We need not labor the point as here it is as plain as a pikestaff that much of this commercial success was brought about by the very improvement over the Beattie-McAuley machine that is the subject of patent No. 2,090,318. We need not fix with precision the exact quantity of success attributable to the patentable as distinguished from the non-patentable features. The plain fact is that the Amco completely superseded the Beattie machine, despite Beattie's expectation to the contrary. We cannot brush off this commercial success as of little significance. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Smith v. Snow, 1935, 294 U.S. 1, 7, 14, 55 S.Ct. 279, 79 L.Ed. 721; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 534-535, certiorari denied 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799; Schering Corp. v. Gilbert, 2 Cir., 1946, 153 F.2d 428, 431-432; E. I. Du Pont De Nemours & Co. v. Glidden Co., 2 Cir., 1933, 67 F.2d 392, 394.
 
 
 17
 Schreiber & Goldberg's first significant contact with Amco occurred in 1936 when they sought an agency to deal in the Amco double point machine. Prior commitments prohibited the granting of such an agency, although Schreiber & Goldberg were allowed to sell to a limited extent on a commission basis between 1936 and 1951. During this time Schreiber & Goldberg were also an exclusive dealer in the competing Beattie machine.
 
 
 18
 This was the condition of the industry until around the latter part of 1949 when plaintiff first marketed the machine covered by the second patent in suit, also devised by Voigt. This is the "half-die machine" which differed from the "quarter-die machine" theretofore in use in that the die sets were enlarged to press the full half portions of a collar. The method of pressing the collar is substantially the same in the half-die as in the quarter-die machines. With the use of the larger dies, however, certain problems or "bugs" were newly encountered or aggravated which Voigt had to solve or remove in order to make its new machine commercially successful. It is the solution to these problems, and not the idea of machine-pressing half of the collar which, Amco claims, constitutes its invention. Some of these solutions, moreover, have been incorporated in the quarter-die machines as well.
 
 
 19
 First the enlargement of the die blades made the yoke arrangement for supplying pressure somewhat inadequate. It was observed that toward the ends of the upper die blades effective pressure was not being exerted and that when more heat was applied to compensate for this defect, the top pressure shoes began to warp. Voigt's solution is the use of auxiliary pressure arms extending from the Y-Yoke to the remoter portions of the upper die blades. This permits the application of uniform pressure throughout the pressure area. Amco asserts that the use of auxiliary localized pressure is a novel element.
 
 
 20
 Secondly, since the table upon which the die assembly is mounted is on a slant, difficulties arose in keeping the collar within the pressure area while and after the internal die blade was retracted. Two methods were devised to meet this development. One is the use of serrations, i. e. tiny grooves or knurls, within the pressure area. The use of these serrations tends to impede the downward slide of the collars and they are frictionally held in place. While the use of serrations is admittedly ancient, their use within the pressure area is claimed to constitute invention. A second solution is the use of spring-pressed detents, or holding pins, projecting through the top pressure shoes to contact and thereby frictionally retain the collar in place.
 
 
 21
 Finally Amco improved its machine by making the supporting carriage of the internal die-blade adjustable horizontally as well as vertically, thereby permitting greater accuracy in the die blade alignment.
 
 
 22
 A patent on these features was applied for June 9, 1950 and patent No. 2,619,267 was granted November 25, 1952.
 
 
 23
 The last of the Beattie-McAuley patents expired in 1950. The Amco patent No. 2,090,318 expired, during the pendency of these two suits, in 1954. In February, 1952 Schreiber & Goldberg, dissatisfied with their current arrangement with Amco, entered into competition with Amco by constructing and selling double point machines virtually identical in design, color, and appearance with the Amco machines. All the alleged inventions covered by the Amco patents were appropriated. The nature of the copying, the character and timing of the Schreiber & Goldberg advertising and their other allegedly unfair acts will be described below.
 
 
 24
 In May, 1952 Schreiber & Goldberg added the half-die machine to their list. In June, 1952 Amco advised Schreiber & Goldberg that they were infringing Amco's first patent and engaging in unfair competition. Schreiber & Goldberg denied both charges and continued their dealings in double point collar pressers. Amco retaliated by bringing suit in October, 1952 for infringement of the first patent and for unfair competition. After its second patent was issued in November, 1952, Amco sued in January, 1953 for infringement of that patent.
 
 
 25
 Although copying all features at first, Schreiber & Goldberg gradually began to make certain changes in their machines. In September, 1952 they began using a bar extending across the upper pressure shoes instead of leaf-springs. In February, 1953 they painted their machines gray instead of dark green and employed a one-piece pressure arm on the half-die machine instead of the multi-piece auxiliary pressure arm of the Amco machine. In September, 1953 they employed a 5/8 inch bar bolted to the upper die to replace their one piece pressure arm with which they had experienced breakage.
 
 
 26
 In January, 1954, Schreiber & Goldberg used a triple pivot — a three shaft toggle arrangement — instead of the Amco double pivot. The rear portion of the stand was also flattened. Schreiber & Goldberg at all times affixed their name-plates to the machines they made and sold.
 
 
 27
 This in general is a sketch of the issues and background of the suit before us. We shall now analyze the issues in their more specialized settings.
 
 Patent No. 2,090,318 Is Valid
 
 28
 We turn first to patent No. 2,090,318, issued to Voigt on August 17, 1937. Viewed in isolation the idea of using a double pivot or twin shaft to harness a force does not seem particularly imposing. For on the machine itself the pedal is first pivoted on an axle, and then again is pivoted on a connecting rod, which in turn is pivoted to the Y-Yoke, which then by the double pivot focuses the force or pressure initiated by the depression of the pedal on to the die recess or pressure area. A pivot is simply a means for altering the direction of a force. It is a very common device and no doubt very old. Just one more pivot would not constitute invention.
 
 
 29
 Similarly the use of leaf-springs or clamps to hold something in place is not an especially novel notion. An ordinary bicycle clamp performs substantially the same function and the use of such a device is also very old.
 
 
 30
 Schreiber & Goldberg labor heavily to prove these very obvious points. But, although the means of implementation selected by Voigt were simple and perhaps obvious in retrospect, the idea which these devices embody is a horse of a different color. The novelty and essence of Voigt's invention was in conceiving that the application of parallel pressure to a substantial portion of the collar would produce the most effectively pressed and shaped collar. It is only after the event that the very simplicity of this ingenious contrivance makes it seem simple and obvious. The fact is that several other inventors who conceived an abundance of original thought on the subject of how to press and shape a smooth collar did not think of it. And it is only by an elaborate and detailed study of the alternate ideas suggested by others that an observer can appreciate the merit of Voigt's conception.
 
 
 31
 Thus the Beattie machine had a single pivot with the result that the pressure applied was partly angular and not completely level. The pressure in the Kaplan device was also partly angular and, being spring-regulated, rather uneven in its application. Moreover, the difficulties encountered in inserting and removing the collar tended to undo any smoothness otherwise secured. McAuley seems to have applied parallel pressure but only to the tip of the point itself. Beattie perceived this defect but did not note the value of the parallel pressure. McTague may have even gone farther although it is by no means clear that he applied parallel pressure. His link arrangement seems to have been intended solely to facilitate the insertion and removal of the collar. A parallel relation between the upper and lower dies is stressed only "at the limit of the separating movement," and not when the pressure is applied. This is corroborated by the provision of a special recess for the surplus material. There is no indication that McTague felt parallel pressure would distribute the interliner evenly throughout the collar. Moreover, even if he did intend to apply level pressure, it could only have been at right angles to the collar center line, while in the Amco machine the pressure is effected in a direction lengthwise of the center line of the collar. In any event, McTague's machine apparently did not work as evidenced by its lack of commercial exploitation. Another collar pressing machine, designed by Garry J. Dormandy, patent application for which was filed June 25, 1931, contributed a means for turning the points of collar tops preparatory to the pressing operation, but its pressing apparatus like the McAuley machine concentrated too extensively on the tip of the point. A mere glance at the complicated machinery of the Dormandy device will suffice to demonstrate that he contributed nothing to the practical solution of the problem that vexed the industry. We have already discussed the significance of the commercial success of the Amco machine, which the facts here show plainly to be due in part to the improvement features disclosed in patent No. 2,090,318. Accordingly, we affirm the decision below upholding the validity of patent No. 2,090,318.
 
 
 32
 In the last analysis the burden of Schreiber & Goldberg's attack on the first patent for lack of invention comes down to its simplicity. But experience in practically every field of human endeavor has demonstrated that the very simplicity of a new idea is the truest and most reliable indication of novelty and invention, when others have devoted extensive effort and exhausted their resourcefulness in a futile search for the solution of the same vexing problem. Potts v. Creager, 1895, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 534, certiorari denied 350 U.S. 911, 76 S.Ct. 193; H. C. White Co. v. Morton E. Converse & Son Co., 2 Cir., 1927, 20 F.2d 311, 313, certiorari denied, 275 U.S. 547, 48 S.Ct. 85, 72 L.Ed. 419.
 
 Infringement
 
 33
 For the most part Schreiber & Goldberg all but concede infringement of the first patent as, indeed, a mere glance at the rival machines will reveal they must. They urge, however, that the cross-bar across the upper pressure shoes is not the mechanical equivalent of plaintiff's leaf-springs. That this argument is not tenable is too obvious for comment. The leaf-springs and bar perform the same function — maintaining the upper shoes in place — and they do so in an identical manner. Graver Tank & Mfg. Co. v. Linde Air Products, 1950, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L. Ed. 147; Priebe & Sons, Inc. v. Hunt, 8 Cir., 1951, 188 F.2d 880, certiorari dismissed, 342 U.S. 801, 72 S.Ct. 92, 96 L. Ed. 607; Royal Typewriter Co. v. Remington Rand, 2 Cir., 1948, 168 F.2d 691, certiorari denied, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379; Musher Foundation, Inc. v. Alba Trading Co., 2 Cir., 1945, 150 F.2d 885, certiorari denied 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465. See 3 Walker, Patents §§ 455, 464-80 (Deller's Ed. 1937). While the Schreiber & Goldberg bar sets a fixed limit to the upper movement of the pressure shoes, whereas the Amco springs permit some flexibility, this difference is of no consequence. The net effect of this flexibility is that the springs follow the pressure shoes down when pressure is applied. But any pressure they might thus apply is merely incidental to their prime function as a stay for the pressure shoes. If Schreiber & Goldberg's bar be deemed an improvement, it is irrelevant to the question of infringement. See Temco Electric Motor Co. v. Apco Manufacturing Co., 1928, 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Hobbs v. Beach, 1901, 180 U.S. 383, 400, 21 S.Ct. 409, 45 L.Ed. 586; Foster Metal Products, Inc. v. Jacoby-Bender, Inc., 1 Cir., 1958, 255 F. 2d 869. The Schreiber & Goldberg bar achieves only this function and no more. In any event, Schreiber & Goldberg clearly rely on the utilization of parallel pressure applied in the identical fashion that Amco does. We affirm the holding below that there was infringement of patent No. 2,090,318.
 
 
 34
 Miscellaneous Defenses to Patent No. 2,090,318
 
 
 35
 Schreiber & Goldberg have raised a number of other miscellaneous defenses to No. 2,090,318, which require a brief discussion solely because the trial judge gave no reasons and made no detailed findings as the basis for his rejection of them all. We find no merit in any of these defenses.
 
 
 36
 First, it is urged that Kaplan and not Voigt was the real inventor of the Voigt machine. It will suffice to say that the reliance upon a brief quotation from Judge Nield's opinion in the Delaware case, taken out of context, is misplaced. The issue in that case, as above noted, was whether Kaplan or McAuley and Beattie had conceived the basic ideas upon which the patents to McAuley and Beattie had been issued. There was no need to decide, nor is there any indication whatever that Judge Nield intended to decide, any conflict of interest between Kaplan and Voigt. And, even if such an intention could be spelled out of Judge Nield's opinion, it would not be binding upon us. Moreover, we have examined with care the testimony given in the Delaware suit by Voigt and compared it with his testimony in the case now before us and we find no reason to reject or seriously question Voigt's unequivocal assertion that he and not Kaplan invented the machine that is the basis of patent No. 2,090,318.
 
 
 37
 Next Schreiber & Goldberg would have us hold that Amco lacks proper legal title to the patent, because of the allegedly executory nature of Voigt's transfer to David Frankel, an officer of Amco, who later assigned his interest in the patent to Amco. The contract, dated July 25, 1934, provides:
 
 
 38
 "It is agreed between Max T. Voigt and David Frankel that the inventions referred to in U. S. application Serial Nos. 735,975, 735,976 and 735,977 are the property of said Frankel for all countries and Voigt for himself, his heirs, executors, administrators, and assigns, and for a valuable consideration, the receipt of which is acknowledged, agrees to execute any and all papers that may be necessary for patenting said inventions or any of them and for transferring such patents or applications therefor to said Frankel or his nominee."
 
 
 39
 If this contract does not clearly transfer title to the patent, it is at worst ambiguous. At the trial, Voigt — who was no longer employed by plaintiff — testified that his intent was to transfer title to patent No. 2,090,318. There was, moreover, a standing agreement between Voigt and Amco that all developments made by him while in Amco's employ were to belong to the company. We find no flaw in Amco's title.
 
 
 40
 Finally, Schreiber & Goldberg contend that Voigt's failure to file a supplemental oath to support the claims ultimately sustained and included in patent No. 2,090,318 voids the patent. In Voigt's original patent application thirteen claims were made broadly dealing with the retractable die blade which were disallowed in view of the Beattie patent. Claim 9 is typical, and does not in terms refer to the double pivot and the leaf-springs. It reads:
 
 
 41
 "9. A garment-shaping machine, comprising in combination, a lower die, an upper die pivotally mounted for co-operation with said lower die, and a die plate mounted for reciprocating movement between said upper and lower dies to deposit a garment therebetween and for removal from between said dies leaving said garment between said dies."
 
 
 42
 However, the specifications and diagrams describing the patentable features were clearly shown; and claim 13 reads: "A garment-shaping machine substantially as shown and described." In amending his claims Voigt did not alter either the specifications or the drawings.
 
 
 43
 Defendants seem to premise their argument on old Rule 48 of the United States Patent Office Rules of Practice in force at the time of Voigt's patent application. Rule 48, identical to the extent quoted to current Rule 67, provided:
 
 
 44
 "When an applicant presents a claim for matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath to the effect that the subject matter of the proposed amendment was part of his invention. * * *"
 
 
 45
 Many cases, however, have interpreted this Rule to mean that a supplemental oath is not necessary when the amended claims may fairly be derived from the original specifications. De La Vergne Refrigerating Machine Co. v. Featherstone, 1893, 147 U.S. 209, 13 S. Ct. 283, 37 L.Ed. 138; Schick Dry Shaver, Inc. v. R. H. Macy & Co., 2 Cir., 1940, 111 F.2d 1018; O. K. Jelks & Son v. Tom Huston Peanut Co., 5 Cir., 1931, 52 F.2d 4; Heller Bros. Co. v. Crucible Steel Co., 3 Cir., 1924, 297 F. 39; Allied Metal Stamping Co. v. Standard Electric Equipment Corp., D.C.E.D.N.Y., 1932, 57 F.2d 296. Since the material features were all described in the original application, even though not claimed, there was no necessity for the supplemental oath. This case is not an instance where the amended claim depends on entirely new features undisclosed in the original application. Cf. Steward v. American Lava Company, 1909, 215 U.S. 161, 30 S.Ct. 46, 54 L.Ed. 139; Westinghouse Electric & Mfg. Co. v. Metropolitan Electric Mfg. Co., 2 Cir., 1923, 290 F. 661; Simpson v. Newport News Shipbuilding & Dry Dock Co., D.C.S.D.N.Y.1920, 18 F. 2d 318, affirmed, 2 Cir., 1927, 18 F.2d 325. Moreover, Rule 48 itself, like the present Rule 67, indicates that adequate disclosure in the "statement of invention" (i. e., the specifications) alone is sufficient to avoid the necessity of a supplemental oath. See Westinghouse Electric & Mfg. Co. v. Metropolitan Electric Mfg. Co., supra, 290 F. at page 664-665.
 
 
 46
 Patent No. 2,619,267 Is Invalid for Lack of Invention
 
 
 47
 We turn now to the second phase of this case concerning patent No. 2,619,267 issued to Voigt in 1952. Although Schreiber & Goldberg have raised a number of technical points of little merit, we do not reach these points as we find the patent invalid for lack of patentable invention.
 
 
 48
 At the outset Amco asks us to view its claims as a "combination patent." It avers that new and useful results are produced which are the product of the combination and not a mere aggregate of separate contributions. However, it does not state what these "new and useful results" are and we think this is due to the fact that there are none attributable to any combination.
 
 
 49
 All of the alleged novel features do, of course, render feasible the half-die machine. But they do so by solving different and basically unrelated problems. The auxiliary pressure arms supply added pressure where needed. The adjustable carriage facilitates the alignment of the die blades. The detents and the serrations each help retain the collars in place after their insertion in the pressure area. Each, however, is apparently sufficient to do the job itself and while combining these features seems logically possible, such combining is by no means necessary. In practice Amco generally uses the detents alone on its quarter-die machinery and the serrations alone on its half-die machines. Schreiber & Goldberg do just the reverse. But each commonly rely on only one of these devices frictionally to hold the collars in place. We thus conclude that each of the bases for "invention" claimed by Amco must stand on its own feet.
 
 
 50
 Amco contends that the novelty inherent in its pressure arms is the use of "auxiliary localized pressure." The three words in quotes are all emphasized to indicate the true uniqueness of this device. On this basis other prior inventions are blithely distinguished. The Beattie patent, No. 1,896,934, which plainly has localized pressure is shown not really to have auxiliary pressure, although the backstop used there could incidentally cause some. The Kaplan and first Voigt patented collar pressers also seem to have auxiliary pressure although of a nature incidental to their cross bar and leaf-springs, which restrain the motion of the upper pressure shoes. Another device, number 1,223,575, patented by M. F. Garlin in 1915 for marginal folding which has localized and adjustable pressure at several points is dismissed as not involving auxiliary force and involving a creasing and not a pressing operation. A creasing machine with extending arms, Thomas No. 1,906,499, patented in 1929, is said to apply only primary pressure and for a different purpose. A folding machine, No. 917,272, patented in 1910 by G. W. Smith, which seems to apply supplementary pressure is claimed to do so in a non-cumulative fashion.
 
 
 51
 We might agree with Amco that its pressure arms are in a limited sense unique as they would almost have to be to meet the demands of this particular machine. But we cannot agree that this uniqueness is truly novel. Once the idea is accepted that the use of pressure is an element that will help mould and shape collars, it is but a mere extension of this principle to use auxiliary pressure if the primary pressure force is inadequate in a given area. And the idea of applying pressure to localized areas is plainly old. We thus conclude that the auxiliary pressure arms employed by Amco, while a useful expedient, do not rise to the level of invention and we set aside the contrary conclusion of the court below as clearly erroneous.
 
 
 52
 The claim relating to the adjustable die-blade carriage (a split carriage) is sought to be sustained on the ground that the flexibility on the horizontal plane (the ability to move the blade forward and backward) introduced by Amco amounts to "invention." The Kaplan and McTague patents showing a two-part carriage for the internal die blade are distinguished as permitting vertical adjustment only (i. e., up and down), while the Beattie patent merely permitted lengthwise adjustment and had no carriage at all. A difference in function is also stressed, whereas the Kaplan machine's vertical adjustment permitted the die blade to be located at the proper height level in relation to the pressure area, the split carriage facilitated the in-and-out movement of the die blade relative to the recesses into which the collar point was received. Further, the Beattie adjustment was intended to provide adequate working room for the operator and to insure a proper alignment between the internal blade and the walls of the external die without which alignment the machine could not press at all. The essence of the Voigt claim is to permit more or less collar to be pressed as desired and to facilitate the alignment between the turning points[2] (if that device is attached to the machine) and the die head.
 
 
 53
 Viewing this claim of "invention" in the most favorable light, it can readily be perceived that nothing new is involved. Not even Amco asserts that the split carriage is a novel mechanical technique. And the concept of adjusting the internal die blades to a desired spatial location is neither original nor unobvious. That Voigt perceived the utility of added flexibility cannot entitle Amco to the rewards of "invention." Here again we are compelled to reject the contrary conclusion by the court below as clearly erroneous.
 
 
 54
 It is conceded by all that serrations are an ancient device as is their use in frictionally holding something in place. Their utilization within a pressure area is said to be different, however, and the difficulties of avoiding indentations on the pressed collar are cited to bolster this view. After the internal die blade with the collar on it is inserted in the die recess, light pressure is applied which, combined with the serrations, hold the collar firm while the blade is withdrawn. Then heat and full pressure are applied to shape the collar.
 
 
 55
 There was some testimony that a Beattie machine used serrations within a pressure area long before Voigt did, but such testimony was subject to substantial doubt and we do not rely upon it.
 
 
 56
 Whether serrations would cause indentations on the collars pressed is largely a question of observation, not invention. Voigt did not discover any magic means to avoid the unwanted consequences. He simply used very fine or shallow grooves and found they left no scars but were still deep enough to do their job. This no doubt required some experimentation to hit upon an acceptable balance. But again we cannot honor such a development as "invention." Voigt simply demonstrated that an old expedient was useful, and the extent of its usefulness is open to question. He created or devised nothing. We find no invention here and reject the conclusion of the District Court to the contrary as clearly erroneous.
 
 
 57
 Amco's claim of invention concerning the spring-pressed detents or holding pins is again based not on the originality of the device per se but rather on their use within the pressure area. The strength of this argument loses much of its vigor when compared with Amco's claim of infringement of a flat spring, used by Schreiber & Goldberg for the same purpose, which does not penetrate the pressure area. If Schreiber & Goldberg's flat springs are the "true equivalent" of Amco's detents — and here we agree with Amco — the location of the detents within the pressure area does not assume much significance.
 
 
 58
 Having thus found that there is no basis upon which the second patent can be sustained, we do not pass upon the questions of estoppel, infringement and prior use and publication.
 
 Unfair Competition by Schreiber & Goldberg
 
 59
 Since the first Voigt patent expired in 1954 and the validity of the second patent cannot be sustained, it becomes imperative to consider the charges of unfair competition. Amco claims it has been damaged by the following overt acts of Schreiber & Goldberg: (1) the manufacture and sale of collar pressing machines virtually identical to Amco's without taking reasonable and proper means to distinguish their products; (2) the use of original parts of Amco's machines in machines sold by Schreiber & Goldberg; (3) the employment of deceitful advertising to mislead prospective purchasers as to the identity of Schreiber & Goldberg and their authority to sell the machines; (4) attempts to hire skilled employees of Amco, while Amco was being beset by a strike, to secure confidential "know how" with respect to the Amco machines.
 
 
 60
 From late 1933 until February 1952 Amco was the sole manufacturer of the "double-point" collar pressing machines heretofore described. This situation existed largely by virtue of its licensing agreement with the McAuley-Beattie interests and partly through the protection afforded by its own patents. During this period — and even to this day — the appearance of Amco's collar pressing machines has remained substantially the same. They have a green-colored four-legged stand with a sloping top of rectangular shape on which the silvery die-assembly is mounted. A switch control unit for electrically heating the pressure area is located toward the upper right-hand corner of the stand. Two internal die blades, retractably movable on a carriage, are aligned with two recessed dies in a side-by-side relationship and both the insertion of the internal die into the recess and the application of the pressure within the recess are actuated by tread-ribbed pedals. Pressure is supplied through a Y-Yoke which by a double-pivoted arrangement causes triangularly-shaped pressure shoes to exert force on the pressure area. Clamp-like leaf-springs retain the pressure shoes in parallel relationship to the bed plate forming the pressure area.
 
 
 61
 As above indicated, Schreiber & Goldberg at first tried to secure an agency to sell Amco machines but, because of existing agency contracts, Amco was only able to permit such sales on a limited commission or discount basis. Spasmodic sales were apparently made by Schreiber & Goldberg in this manner as far back as 1936. During the period 1948-1952 the strong customer demand for the Amco collar presser, in preference to the Beattie machine, made this limited commission arrangement quite unsatisfactory from the Schreiber & Goldberg point of view. As a result they decided to make a facsimile of the Amco machine "and take our chances."
 
 
 62
 Upon entering into competition with Amco in February 1952 (the last of the Beattie patents had expired in 1950), Schreiber & Goldberg copied every one of the features described and did so in minute detail, differing only microscopically if at all. The tables or stands, for example, are almost identical in shape, design, structure and dimension. Thus, the slope of plaintiff's table top is 37 degrees; defendants' table top slopes at 37 degrees, 15 minutes, an insignificant variation when dealing with pressed steel. Castings of Amco serial numbers were used. Schreiber & Goldberg dies are interchangeable with Amco's dies, each being provided with mounting holes spaced to facilitate their ready mounting upon the stand of the Amco machines.
 
 
 63
 The features and parts copied are, however, all useful. Thus the sloping table, for example, facilitates the observation and control of the operator. The tread-ribbed configuration on the pedals helps avoid any slipping of the foot during the course of operations. The location of the switch-control unit no doubt facilitates the operator's view while not obstructing the workings of the die assembly. Even the dark green hue selected may serve to minimize the glare as well as enhance the machine's appearance.
 
 
 64
 On the other hand, Schreiber & Goldberg could have distinguished their machine in a myriad of ways. The table top could have been oval rather than rectangular. A different slope could have been chosen. The Y-Yoke was not the only means available to supply pressure. Other forms and configurations of tread ribs could have been used on the foot pedal. Indeed, Schreiber & Goldberg themselves demonstrated some of the available variations. By 1954 they were employing a retaining bar instead of leaf-springs, a gray-colored stand, a one piece pressure arm and/or a 5/8 inch bar instead of a multi-piece pressure arm, a three-shaft toggle arrangement, and a flattened rear top portion of the stands. At all times, moreover, Schreiber & Goldberg did affix their name plates in a prominent position on each of the machines.
 
 
 65
 In some instances, however, machines sold by Schreiber & Goldberg included parts made by Amco, with the result that the names of both Amco and Schreiber & Goldberg appeared on the machines. Further, one of the Schreiber & Goldberg officials admitted that dealers frequently replaced the manufacturer's name plate with their own. But, Schreiber & Goldberg point out, the purchasing public involved herein is limited to the 2,000 informed shirt manufacturers of the country. Sales were generally made only after careful consideration. Demonstration and periods of testing prior to purchasing were common. Further, the invoice of sale always included the Schreiber & Goldberg name.
 
 
 66
 Amco contends that the unique combination of features it employs taken in conjunction with the fact that for almost twenty years it alone produced such a machine have led to the association by the industry of the machine with Amco. Such an association has been strengthened and nurtured by an extensive advertising and development campaign, and the fact is, as above stated, that 80 per cent of the shirt manufacturers producing about 95 per cent of the country's shirts use the Amco "double point" machines. Moreover, Amco asserts, it has achieved an excellent reputation in the industry for "workmanship, reliability of performance and long trouble-free life." It is the absence of the advertising, development and engineering costs, including those incurred during the period of experimentation leading to the patents, Amco avers, that enable Schreiber & Goldberg to sell its machines for less.
 
 
 67
 It is charged that the Schreiber & Goldberg advertising has contributed to its scheme of unfair competition. For example, the listing in Schreiber & Goldberg trade journal advertisements, side by side, the name of Amco exclusive agents together with the name of the real Schreiber & Goldberg agent. Four such occurrences are cited, two in 1952, two in May and June of 1954. The claim that such listings were "inadvertent" need not detain us as the earlier errors were known to Schreiber & Goldberg at the time of the later listings. In another advertisement in the Sunbrand Catalogue, put out by the Schreiber & Goldberg southern sales representative, a duplicate of the Amco machine is shown, but nowhere does the Schreiber & Goldberg name appear as manufacturer, except for its all but invisible presence on the nameplate of the machine illustrated.
 
 
 68
 Finally, Amco argues that Schreiber & Goldberg copied some of its advertisements as evidenced by similar layout and descriptive language. While there is some resemblance, we think this phase of the evidence is of minor significance. Amco has no monopoly over the descriptive language used. There are a limited number of ways one can describe various features of the machines and it is not surprising that there should be some overlap of description as the machines are identical in construction, design and appearance. See Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 1911, 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536; Joshua Meier Co. v. Albany Novelty Mfg. Co., 2 Cir., 1956, 236 F.2d 144; Viavi Co. v. Vimedia Co., 8 Cir., 1917, 245 F. 289, certiorari denied, 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928; Caswell v. Davis, 1874, 58 N.Y. 223.
 
 
 69
 Amco also relies upon Schreiber & Goldberg's highly questionable attempt to procure special knowledge and information from its skilled employees in May and June, 1952. At that time the Amco plant in Reading, Pennsylvania, was shut down by a strike and Schreiber & Goldberg advertised for skilled help only in a local Reading newspaper. The uncontradicted testimony of the employees responding to the advertisement indicates a direct effort to elicit confidential information. However, this part of Schreiber & Goldberg's scheme failed to induce a breach of faith by the Amco employees and no harm was done. While not condoning such tactics, we do not believe they have much bearing on the unfair competition phase of the case, except Schreiber & Goldberg's intent deliberately to appropriate and derive a profit from Amco's machines and reputation, which is, in any event, sufficiently evident.
 
 
 70
 There is some but not much evidence of actual confusion. In one instance a purchaser of one of Schreiber & Goldberg's machines pointed toward the purchased machine and exclaimed to Amco's president, "This is your machine." In other cases complaints as to defective parts were submitted to Amco, although a Schreiber & Goldberg machine had been purchased. A few other purchasers ordered parts from Amco using Schreiber & Goldberg serial numbers or referring to a trade exhibition in which Amco had not participated. A couple of other manufacturers voiced uncertainty as to who was the producer of advertised or exhibited machines. However, no direct testimony was proffered to indicate that anyone had actually purchased a machine from Schreiber & Goldberg thinking they were buying from Amco. The Amco sales figures for the fiscal years 1952 to 1956 reflect a steady decline in sales from the year ending May 31, 1954 onward; but there was a rise of about 25% in the fiscal year ended May 31, 1953.[3]
 
 
 71
 Despite this record of wilful and cunningly contrived pirating the District Court found that no unfair competition had been established, because it found that the Amco machines had not acquired a secondary meaning. We have reached a different conclusion.
 
 
 72
 We pass over the choice of law problem that immediately confronts us as counsel for the respective parties do not discuss it and the same result would appear to follow in this case, whether federal or state law is applicable. See Yale Electric Corp. v. Robertson, 2 Cir., 1928, 26 F.2d 972, 973; Gum, Inc. v. Gumakers of America, 3 Cir., 1942, 136 F.2d 957, 960; Continental Casualty Co. v. Beardsley, D.C.S.D.N.Y., 1957, 151 F.Supp. 28, 42-43, modified and affirmed, 2 Cir., 1958, 253 F.2d 702; Note, 60 Harv.L.Rev. 1315 (1947). State courts very generally consult the entire body of law in this field, both the decisions of courts and the comments and conclusions arrived at by text-writers of reputation,[4] and there is nothing to be gained in this case, where no conflict is apparent, by unnecessarily rushing in where angels fear to tread. See Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 1955, 234 F.2d 538. Since most cases involve interstate transactions, perhaps some day the much needed federal statute or uniform laws on unfair competition will be passed. Lunsford, Unfair Competition: Uniform State Act Needed, 44 Va.L.Rev. 583, 584 (1958).
 
 
 73
 The key that we think will unlock the tightly confined mass of complex issues and at the same time lead to a solution of the problem of how to deal with the scheme so ingeniously devised and so gradually unfolded and carried out by Schreiber & Goldberg is a simple one. Amco has lumped together and failed to discriminate between two quite different phases of the evidence. Were it possible to view in isolation the production and sale of the Schreiber & Goldberg Chinese copies of the Amco machines, the charge of unprivileged imitation might fall of its own weight, except insofar as there was infringement of a valid patent.[5] But so much of the evidence as discloses Schreiber & Goldberg's fraudulent scheme to market its products in such fashion as to poach upon Amco's preserves is actionable,[6] and this evidence, considered together with the copying of every detail of the Amco machines, makes every feature of the whole scheme actionable in its entirety. While both production and marketing at heart deal with confusion as to source, it will be seen that different elements and different policy considerations are involved in each and the distinction between these aspects of the case must be kept in mind if we are to pursue a meaningful analysis. See Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725, certiorari denied, 1946, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681; William H. Keller, Inc. v. Chicago Pneumatic Tool Co., 7 Cir., 1923, 298 F. 52, 57, certiorari denied, 1924, 265 U.S. 593, 44 S.Ct. 637, 68 L.Ed. 1196; Myles Standish Mfg. Co. v. Champion Spark Plug Co., 8 Cir., 1922, 282 F. 961.
 
 
 74
 The principles which we think govern the determination of the unfair competition issues in the case now before us, as just stated, can only be effectively and clearly applied in the setting of generally accepted rules of law in this complex and still developing area. We shall, therefore, undertake a brief discussion of these general principles.
 
 
 75
 In approaching the question of whether Schreiber & Goldberg's copying of the Amco machine is actionable, it must be remembered that the interests and equities of the litigants at bar are not the only ones which must be considered. Indeed, the underlying principles of our competitive economy and the desirability of passing on to the American public the advances of technical progress not only are entitled to consideration, in fact they dominate the picture although the interests of the public are not represented by either of the parties to the action. See 3 Restatement of Torts, C. 35, Introductory Note at pp. 537-38 (1938); 69 Harv.L.Rev. 392, 393 (1955). Hence at first glance it might seem intolerable that one manufacturer should be allowed to sponge on another by pirating the product of years of invention and development without license or recompense and reap the fruits sown by another. Morally and ethically such practices strike a discordant note. It cuts across the grain of justice to permit an intruder to profit not only by the efforts of another but at his expense as well. See 1 Callmann, Unfair Competition and Trade-Marks, pp. 257-58 (2d ed. 1950).
 
 
 76
 But this initial response to the problem has been curbed in deference to the greater public good. See Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279, certiorari denied 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145; Millinery Creators' Guild, Inc. v. Federal Trade Commission, 2 Cir., 1940, 109 F.2d 175, 177, affirmed, 1941, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955; J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 1941, 120 F.2d 949, 953, 958; Huston v. Buckeye Bait Corp., D.C.S.D.Ohio, 1955, 145 F.Supp. 600, 606, affirmed 6 Cir., 1956, 237 F.2d 920. For imitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity. See Chamberlin, The Theory of Monopolistic Competition, p. 16 (1956); Samuelson, Economics, p. 440 (1955); Stock & Watkins, Monopoly and Free Enterprise, p. 13 (1951); Handler, Cases on Trade Regulation, pp. 48-49 (2d ed. 1951). Unless such duplication is permitted, competition may be unduly curtailed with the possible resultant development of undesirable monopolistic conditions. The Congress, realizing such possibilities, has therefore confined and limited the rewards of originality to those situations and circumstances comprehended by our patent, copyright, and trade-mark laws. When these statutory frameworks are inapplicable, originality per se remains unprotected and often unrewarded.[7] For these reasons and with these limitations the bare imitation of another's product, without more, is permissible.[8] And this is true regardless of the fact that the courts have little sympathy for a wilful imitator.
 
 
 77
 While the duplication of another's product without more has thus been sanctioned, the courts have been wary about the extent to which the imitator should be permitted to take advantage of the originator's efforts. Hence when, in addition to simulating the originator's product the second-comer unnecessarily created the impression in the minds of the purchasing public that the originator was also the source of the simulated product, the courts were quick to decry such "palming off" or "poaching" as an unlawful concomitant of the privileged imitation,[9] and the body of learning called the law of unfair competition thus emerged.[10]
 
 
 78
 The application of these simple fundamental principles has often proved to be intricately troublesome. The basic difficulty stems from the fact that by the very process of the simulation which the law permits, there is the almost inseparable suggestion created that the source of the simulated product is the maker of the original product. As in the case at hand, frequently a long period of association has developed between the original product and the original producer. In fact, after a time it becomes difficult to tell whether the purchasers buy primarily because of the virtues of the product or because of confidence in and reliance on the original producer's skill. Unless warned to the contrary, they may easily mistake the simulated product for the original, especially if they are unaware of the existence of the second comer. Such confusion is natural and perhaps, to a degree, an unavoidable result of permissible imitation. See Grosjean v. Panther-Pance Rubber Co., D.C.D. Mass., 1939, 26 F.Supp. 344, 352, affirmed, 1 Cir., 1940, 113 F.2d 252.
 
 
 79
 Since a certain amount of confusion as to source was inherent in the process of imitation, the courts have developed a body of principles by which to determine whether or not the confusion was permissible. The similarities and differences in the products were examined to determine the likelihood of confusion. Joshua Meier Co. v. Albany Novelty Mfg. Co., 2 Cir., 1956, 236 F.2d 144; Sylvania Electric Products Co. v. Dura Electric Lamp Co., 3 Cir., 1957, 247 F.2d 730; Sinko v. Snow-Craggs Corp., 7 Cir., 1939, 105 F.2d 450; Flint v. Oleet Jewelry Mfg. Co., D.C.S.D.N.Y., 1955, 133 F. Supp. 459. The necessity and the utility of the copying were studied to ascertain whether the interest of the public or that of the originator was paramount. Compare Yale & Towne Mfg. Co. v. Alder, supra, 2 Cir., 154 F. 37; Rushmore v. Badger Brass Co., 2 Cir., 1912, 198 F. 379; American Chain Co. v. Carr Chain Works, 1931, 141 Misc. 303, 252 N.Y.S. 860, with Sylvania Electric Products Co. v. Dura Electric Lamp Co., supra, 3 Cir., 247 F.2d 730; Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp., 3 Cir., 1953, 202 F.2d 172, certiorari denied 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346; James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 1942, 128 F.2d 6, certiorari denied 317 U.S. 674, 63 S. Ct. 79, 87 L.Ed. 541. Of course, the fundamental need for the association between the originator and his product had to be demonstrated before any discussion of confusion could even start, Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 1917, 247 F. 299; American Fork & Hoe Co. v. Stampit Corp., 6 Cir., 1942, 125 F.2d 472; Avon Periodicals v. Ziff-Davis Pub. Co., Sup.1952, 113 N.Y. S.2d 737, affirmed, 1st Dep't, 1953, 282 App.Div. 200, 122 N.Y.S.2d 92; and the fact that the public even cared who was the source was not taken for granted. See Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Charles D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416; General Time Instruments Corp. v. U. S. Time Corp., 2 Cir., 1948, 165 F.2d 853, certiorari denied 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770; Selchow & Righter Co. v. Western Printing & Lithographing Co., 7 Cir., 1944, 142 F.2d 707, certiorari denied 323 U.S. 735, 65 S.Ct. 75, 89 L.Ed. 589. Thus, the crucial distinction evolved: it was permissible for the purchasers to be confused between products; but any unnecessary confusion as to source would not be condoned. West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, certiorari denied 350 U.S. 840, 76 S.Ct. 80, 100 L. Ed. 749.
 
 
 80
 In this perspective we turn to the facts at bar. We have no difficulty in perceiving that the industry of shirt manufacturers had come to associate with Amco the peculiar collocation of features — design, color, shape, size and appearance — assembled in the Amco machines and unchallenged for almost two decades. Indeed, the evidence clearly shows that there was no other machine in the entire garment industry resembling it.
 
 
 81
 It is not clear, however, that the shirt manufacturers bought Amco double point collar pressers primarily or even in substantial part because they were made by Amco, rather than because they liked the machine. This is probably the basis for the finding by the trial judge that the Amco machines had not "acquired a secondary significance," which he erroneously thought disposed of the unfair competition phase of the case.
 
 
 82
 It is true that Amco's machines had built up a reputation for dependability and long life and hence the fact that Amco and not someone else manufactured them might have been influential in the decision of a manufacturer to make the substantial capital investment necessary in the purchase of the machines. However, since there was no one else during this period making a machine similar to Amco's, such a hypothesis is difficult to verify, especially as it was not common practice to purchase such a machine without considerable testing. Of course, though Schreiber & Goldberg in the course of time offered their machines in competition with Amco's at lower prices, the greater portion of the industry has as yet remained with Amco, although admittedly there has been a substantial diversion of trade. However, the reasons for such decisions to purchase one or another of the competing machines are probably many and complex and the proofs that we have summarized are inconclusive at best.
 
 
 83
 Also important to the unfair competition issue are the questions, argued at some length in the briefs, whether the features of the Amco machines copied by Schreiber & Goldberg are actionably confusing. In part this involves the problem of whether the copied features were functional or "devised to give individuality and a distinctive appearance." At bottom the more the imitator copies mere arbitrary, ornamental or decorative gadgets that give the machine its characteristic appearance, as contrasted with functional features that make it more useful in the performance of its intended purpose, the more the imitator treads upon forbidden ground. See Mastercrafters Clock and Radio Co. v. Vacheron, 2 Cir., 1955, 221 F.2d 464, certiorari denied 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743; Enterprise Manufacturing Co. v. Landers, Frary & Clark, 2 Cir., 1904, 131 F. 240; Wesson v. Galef, D.C.S.D.N.Y., 1922, 286 F. 621; Avon Periodicals v. Ziff-Davis Pub. Co., supra, Sup.1952, 113 N.Y.S.2d 737, affirmed, 1 Dept., 1953, 282 App.Div. 200, 122 N.Y. S.2d 92. On the other hand, we are mindful of the fact that where the person making the charge of unfair competition has enjoyed the benefits of patent protection, the courts have repeatedly taken a broad view of the extent of the contribution to the public domain. See Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109; Rice-Stix Dry Goods Co. v. J. A. Scriven Co., 8 Cir., 1908, 165 F. 639, certiorari denied, 1909, 212 U.S. 582, 29 S.Ct. 692, 53 L.Ed. 660; G. & C. Merriam Co. v. Ogilvie, 1 Cir., 1908, 159 F. 638, 640, certiorari denied 209 U.S. 551, 28 S.Ct. 761, 52 L.Ed. 922; Lenox, Inc. v. Jones, McDuffee & Stratton Corp., D.C.D.Mass., 1921, 271 F. 511.
 
 
 84
 We have already observed that each of the various component parts that tend to give the Amco machines the appearance that has helped to identify them with manufacturers serve some useful purpose.[11] At the same time there is no denying the fact that none of the simple and readily available methods by which the Schreiber & Goldberg machines could have been distinguished from the Amcos was used, except the affixation of their nameplates. But all that is required is that the means of distinction employed be reasonable under the circumstances, bearing in mind, inter alia, the interest of the public in the advances of technical progress and economic competition, the degree of similarity in the rival products, the alternate means of production available, the nature and cost of the product, the type of customers generally involved, and the negotiations and care usually employed prior to making a purchase. See J. C. Penney Co. v. H. D. Lee Mercantile Co., supra, 8 Cir., 1941, 120 F.2d 949; Swank, Inc. v. Anson, Inc., D.C.D.R.I., 1951, 104 F. Supp. 703, affirmed, 1 Cir., 1952, 196 F.2d 330; Pocket Books, Inc. v. Meyers, 1944, 292 N.Y. 58, 54 N.E.2d 6. There is no hard and fast rule as to what is a "reasonable" means of distinction; and we are not called upon to decide whether or not the affixation of the nameplates of Schreiber & Goldberg would have been deemed sufficient in view of the ambiguous use of nameplates in the industry, were we dealing solely with production, i.e., with the copying alone. Landis Machinery Co. v. Chasa Tool Co., 6 Cir., 1944, 141 F.2d 800, certiorari denied 323 U.S. 720, 65 S.Ct. 52, 89 L.Ed. 579; Harvey Hubbell, Inc. v. General Electric Co., D.C.S.D.N.Y., 1919, 262 F. 155; Eastern Construction Co. v. Eastern Engineering Co., 1927, 246 N.Y. 459, 157 N.E. 397, with American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 1953, 208 F.2d 560; J. C. Penney Co. v. H. D. Lee Mercantile Co., supra, 8 Cir., 120 F. 2d 949; Brinkman v. Laurette Mfg. Co., D.C.D.N.J., 1927, 21 F.2d 607. Here, as hereinafter set forth, Schreiber & Goldberg resorted to fraudulent marketing and the case must be viewed as a whole. Thus viewed we have no alternative other than to connect the production and the marketing. Indeed, they cannot be separated; the fraud and wilful deception of Schreiber & Goldberg as to both production and marketing of the machines is manifest. Had a finding to the contrary been made we would be required to set it aside as clearly erroneous.
 
 
 85
 Although we have not concluded that at the production level the mere simulation of plaintiff's machine was actionable under the conditions of our competitive economy, the high degree of similarity between the litigants' machines is still a material factor in evaluating the second part of Amco's claim of unfair competition, that dealing with defendants' alleged fraudulent marketing. See Singer Mfg. Co. v. June Mfg. Co., supra, 163 U.S. 169, 16 S.Ct. 1002; Rice-Stix Dry Goods Co. v. J. A. Scriven Co., supra, 8 Cir., 165 F. 639, 647; Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 1st Dep't, 1952, 3 A.D.2d 227, 159 N.Y.S.2d 606. For Schreiber & Goldberg, even though the possibilities of confusion as to source attributable to its copying Amco's machine were to be tolerated, are certainly under a duty not to aggravate the potentialities for confusion by questionable marketing techniques. See Singer Mfg. Co. v. June Mfg. Co., supra; Noma Lites, Inc. v. Lawn Spray, Inc., 2 Cir., 1955, 222 F.2d 716; Ralston Purina Co. v. Saniwax Paper Co., D.C.W.D.Mich., 1928, 26 F.2d 941; Charles S. Cash, Inc. v. Steinbook, 1 Dep't, 1927, 220 App.Div. 569, 222 N.Y. S. 61, affirmed, 1928, 247 N.Y. 531, 161 N.E. 170. In our view of the controversy, Schreiber & Goldberg have been guilty of grossly violating this duty.
 
 
 86
 Schreiber & Goldberg did not restrict their activities to the making of Chinese copies of the Amco machines. They had an uphill sales battle on their hands. For almost twenty years prior to 1952 Amco had been unchallenged in the manufacture and distribution of these machines; it was well known in the field, entrenched behind a good reputation and a strong marketing system. Schreiber & Goldberg were not content to rely upon price savings alone to offset Amco's goodwill and experience and the fear of infringing Amco's patents. What they resolved to do, and what they did with great cunning, was to make use of Amco's goodwill without authorization, and thus gradually slip their machines into circulation. This was easier than to fight Amco in the open. If steps could be taken to create the impression that while in business for themselves they were authorized to make and sell Amco machines, this impression would be confirmed by the identity of the machines in appearance and would not be negated by the affixation of the Schreiber & Goldberg nameplate in view of the common practice of dealers to affix their own nameplates.
 
 
 87
 This scheme and some indication of its apparent success is amply borne out by the evidence. The trade journal advertisements including Schreiber & Goldberg's sales agent along with well-known exclusive agents of Amco could only be intended to suggest some authorized relationship with Amco. The omission of the Schreiber & Goldberg name in the Sunbrand Catalogue displaying a machine long associated with Amco points strongly to an attempt to suggest a bona fide relationship between Schreiber & Goldberg's sales agent and Amco. The use of parts made by Amco in Schreiber & Goldberg's machines and the absolute interchangeability of all parts further strengthened this illusory implication. On the other hand, if some purchasers did not even realize that Schreiber & Goldberg were manufacturing Amco machines, Schreiber & Goldberg were not adverse to benefiting from this misapprehension as well.
 
 
 88
 The resultant confusion which did in fact occur also supports our conclusion of a campaign of deliberately contrived misrepresentation. It is a fair inference that this is the reason purchasers of Schreiber & Goldberg machines complained to Amco; and prospective purchasers of parts used Schreiber & Goldberg serial numbers. They appeared to be all of the same family. Otherwise, why should a customer tell Amco's president that a machine it bought from Schreiber & Goldberg was Amco's? We find it unnecessary to catalogue the other evidence in this record of fraudulent marketing by Schreiber & Goldberg, straws which show the direction from which the wind is blowing. There is no overriding social policy that would serve to justify fraudulent marketing. Such sharp practice serves no desirable objective whatever.[12] Thus there is no need to be detained by questions concerning the establishment of a secondary meaning. It is not necessary that the source be the primary motivation for purchase. In fact, we are content on this point to accept the forecast of Schreiber & Goldberg that the confusion as to source would be as important as they intended it to be. See Wesson v. Galef, D.C.S.D. N.Y., 1922, 286 F. 621, 625. Nor are we, in view of the deliberate plan to poach unjustifiably on Amco's goodwill, disposed to debate in detail the probabilities of confusion. Cf. Mastercrafters Clock and Radio Co. v. Vacheron, supra, 2 Cir., 221 F.2d 464, certiorari denied 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743.
 
 
 89
 In summary then, we find the following undisputed facts sufficient to establish as a matter of law a deliberately contrived scheme of fraudulent marketing existing at least during the first two years of Schreiber & Goldberg's Amco operations: (1) simulation of machines to the last detail, including castings of Amco serial numbers, when numerous distinguishing alternatives existed; (2) the use of Amco parts in machines marketed by Schreiber & Goldberg; (3) several instances of misleading advertising; (4) several instances of customer confusion in making complaints, seeking replacements, and requesting repairs.
 
 
 90
 The net result is that the fraudulent scheme as a whole must be condemned. Because joined with improper and deceitful marketing methods the making of the Chinese copies becomes unlawful, in the absence of the taking of reasonable and proper steps by Schreiber & Goldberg to distinguish their machines from the Amcos.
 
 
 91
 The judgment in the second action holding Amco patent No. 2,619,267 valid and infringed and allowing a counsel fee is reversed and the complaint dismissed, with costs to Schreiber & Goldberg.
 
 
 92
 The judgment in the first action is affirmed insofar as it holds Amco patent No. 2,090,318 valid and infringed and directs an accounting but reversed insofar as it dismissed the claim of unfair competition and the case is remanded for the following further proceedings: (1) in connection with the accounting to ascertain the damages sustained by Amco by reason of the infringement of its patent No. 2,090,318, there shall be an assessment of the damages sustained and profits lost by Amco by reason of the fraudulent practices described in this opinion[13] up to the time of discontinuance of such practices, if same were discontinued after 1954; (2) there shall be formulated and made effective an injunction permanently restraining Schreiber & Goldberg from the continuance of their scheme of fraudulent marketing, by advertising and otherwise, and ordering Schreiber & Goldberg to adopt reasonable means to distinguish their machines from the Amcos;[14] and (3) for reconsideration of that part of the judgment as denies any counsel fee to Amco's attorneys,[15] and for the fixing of the amount thereof in case such fee is allowed, in place of the counsel fee included in the judgment in the second case, which we have reversed. On the appeal in the first case we grant costs to Amco.
 
 
 93
 Affirmed in part; reversed in part; and remanded.
 
 
 
 Notes:
 
 
 [1]
 See Beattie Mfg. Co. v. Tutelman-Kohn-Marcus, Inc., D.C.D.Del.1937, 19 F.Supp. 114. 115
 
 
 [2]
 Many of the machines used by the industry over the years were equipped with single or double slender metal parts that could be moved together. These are called turning points and, in order to turn the collar inside out preparatory to pressing and moulding, the collar is placed over the lower point, the two points are then brought together, and this facilitates the operation of quickly turning the collar. These turning points have nothing to do with the patents involved in these two cases
 
 
 [3]
 The volume of sales of Amco's double-point collar pressing machines are as follows:
 Fiscal Year ending May 31, 1952 $181,895.98
 " " " May 31, 1953 227,050.77
 " " " May 31, 1954 188,900.08
 " " " May 31, 1955 166,828.67
 " " " May 31, 1956 153,364.57
 
 
 [4]
 Thus, the New York courts commonly refer to federal cases. See, e. g., Pocket Books, Inc. v. Meyers, 1944, 292 N.Y. 58, 54 N.E.2d 6; Winifred Warren, Inc. v. Turner's Gowns, Ltd., 1941, 285 N.Y. 62, 68, 32 N.E.2d 793; Germanow v. Standard Unbreakable Watch Crystals, 1940, 283 N.Y. 1, 27 N.E.2d 212; Michel Cosmetics, Inc. v. Tsirkas, 1940, 282 N.Y. 195, 26 N.E.2d 16; Neva-Wet Corp. of America v. Never Wet Processing Corp., 1938, 277 N.Y. 163, 13 N.E.2d 755; Eastern Construction Co. v. Eastern Engineering Corp., 1927, 246 N.Y. 459, 159 N.E. 397; Fisher v. Star Co., 1921, 231 N.Y. 414, 132 N.E. 133, 19 A.L.R. 937; Westcott Chuck Co. v. Oneida National Chuck Co., 1910, 199 N.Y. 247, 92 N.E. 639
 
 
 [5]
 See Restatement of Torts, Section 741 (1938)
 
 
 [6]
 See Restatement of Torts, supra, Section 712
 
 
 [7]
 See Cheney Bros. v. Doris Silk Corp., supra; Lewis v. Vendome Bags, Inc., 2 Cir., 1939, 108 F.2d 16, certiorari denied, 309 U.S. 660, 60 S.Ct. 514, 84 L.Ed. 1008; A. C. Gilbert Co. v. Shemitz, 2 Cir., 1930, 45 F.2d 98, 100; Germanow v. Standard Unbreakable Watch Crystals, Inc., 1940, 283 N.Y. 1, 27 N.E.2d 212
 
 
 [8]
 Meccano, Ltd. v. John Wanamaker, 2 Cir., 1918, 250 F. 450, affirmed, 1920, 253 U.S. 136, 40 S.Ct. 463, 64 L.Ed. 822; Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266; Remington-Rand, Inc. v. Mastercraft Corp., 6 Cir., 1933, 67 F.2d 218; John H. Rice & Co. v. Redlich Mfg. Co., 3 Cir., 1913, 202 F. 155
 
 
 [9]
 See, e. g., Howard v. Hendriques, 1851, 3 Sandf. 725, 727, 5 N.Y.Super.Ct. 725, 727; Searchlight Gas Co. v. Prest-O-Lite Co., 7 Cir., 1914, 215 F. 692; Yale & Towne Mfg. Co. v. Alder, 2 Cir., 1907, 154 F. 37
 
 
 [10]
 Problems relating to the extension and development of this doctrine into areas beyond "passing off" are not within the purview of this case. See, e. g., International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211; Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631; Germanow v. Standard Unbreakable Watch Crystals, Inc., supra, 283 N.Y. 1, 27 N.E.2d 212
 
 
 [11]
 Moreover, as long as the source is properly identified, there is nothing wrong in defendants' manufacture of parts interchangeable with plaintiff's. Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 1935, 78 F.2d 700, certiorari denied 296 U.S. 648, 56 S.Ct. 310, 80 L. Ed. 461; Myles Standish Mfg. Co. v. Champion Spark Plug Co., 8 Cir., 1922, 282 F. 961; Deering Harvester Co. v. Whitman & Barnes Mfg. Co., 6 Cir., 1898, 91 F. 376; Harvey Hubbell, Inc. v. General Electric Co., D.C.S.D.N.Y., 1919, 262 F. 155
 
 
 [12]
 See J. C. Penney Co. v. D. H. Lee Mercantile Co., supra, 8 Cir., 120 F.2d 949; Sperry & Hutchinson Co. v. Mechanics Clothing Co., C.C.D.R.I., 1904, 128 F. 800; 1 Nims, Unfair Competition and Trade-marks, p. 29 (4th Ed. 1947)
 
 
 [13]
 See Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 1916, 240 U.S. 251, 263, 36 S.Ct. 269, 60 L.Ed. 629; Pastificio Spiga Societa Per Azioni v. De Martini Macaroni Co., 2 Cir., 1952, 200 F.2d 325; Dad's Root Beer Co. v. Doc's Beverages, Inc., 2 Cir., 1951, 193 F.2d 77; Coca-Cola Co. v. Dixi-Cola Laboratories, 4 Cir., 1946, 155 F.2d 59, certiorari denied, 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665; Winifred Warren, Inc. v. Turner's Gowns, Ltd., 1941, 285 N.Y. 62, 32 N.E.2d 793; Platinum Products Corp. v. Berthold, 1939, 280 N.Y. 752, 21 N.E.2d 520; Westcott Chuck Co. v. Oneida N. Chuck Co., 1910, 199 N.Y. 247, 92 N.E. 639
 
 
 [14]
 Although we have held the simulation of the machinesper se privileged, the fraudulent marketing practices justify the requirement of reasonable distinguishing features for the future. See Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Sperry & Hutchinson Co. v. Mechanics' Clothing Co., C.C.D.R.I., 1904, 128 F. 800.
 
 
 [15]
 35 U.S.C. § 285 provides that under the Patent Act: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."
 
 
 
 94
 CLARK, Chief Judge (dissenting).
 
 
 95
 The wealth of detail in the opinion, coupled with its sophisticated employment of such emotive words as "poach," "deceitful," "fraudulent," and "cunningly contrived pirating," without orientation in specific findings, serves to mask the essentially revolutionary character of this decision. For what is happening is that a weak and simple patent, which has already expired, is being parlayed into a perpetual monopoly over an area broader than ever was visualized for the patented device itself. I realize that a dissenting judge should exercise appropriate restraint in stating conclusions which his brothers have rejected; even so I have to say that the broad and devastating result here achieved seems to me quite unique in its variance from the record and the parties' claims thereto. The all but wholly obscured truth is that the well known concept of unfair competition is being employed to fashion and shelter a monopoly where, as the record pretty thoroughly demonstrates, the ideas are public and their use is to be encouraged.
 
 
 96
 The patent here upheld — Voigt No. 2,090,318, issued in 1937 — is very weak indeed. Voigt's first application in 1934 contained thirteen claims dealing generally with the pressing machine and primarily with the retractable feature of the thin metal part used to position the collar point between the pressing dies.[1] All of these claims were rejected by the examiner primarily on the basis of the Beattie and McAuley contributions to the prior art. Thereafter Voigt presented for the first time his ultimately successful claims relating to the double-pivot arrangement by which the pressure on the foot pedal is transmitted to the press. In fact the plaintiff regarded this patent so lightly that it did not even bother to list it on its machines while the McAuley-Beattie patents, under which it had a license, were in force. It took pains, however, to list these earlier patents most carefully — a significant demonstration as to where in its view (and mine, too) invention really lay. The double-pivot arrangement which the patent covers is hardly novel in itself. It is a simple and common adaptation of the lever — the oldest known mechanical device — with one pivot serving as a fulcrum, and the other merely as a flexible connection to the pressing die. The device is not dissimilar to the use of the lever in any of its multifold uses in everyday life. Moreover, precisely the same arrangement of pivot points was similarly utilized earlier by McAuley in his collar pressing machine. And the leaf spring, which is claimed in some uncertain manner as part of the patented device, is just that — a common leaf spring.
 
 
 97
 Conceding all this the majority finds novelty in the "essence of Voigt's invention," which "was in conceiving that the application of parallel pressure to a substantial portion of the collar would produce the most effectively pressed and shaped collar." The opinion further suggests that this discovery solved a problem which had vexed many other craftsmen in the art and that the commercial success of the plaintiff's collar pressing machines is in some indefinite way attributable to it. But this will not do. For the patent utterly fails to disclose or even to claim this "novelty," and hence cannot be upheld on the basis of it. 35 U.S.C. § 112; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 82 L.Ed. 1402. Moreover, if "parallel pressure" is indeed the essence of plaintiff's invention, it is difficult to understand why the leaf spring is included in the patented device. As plaintiff itself stresses in its brief: "in the Amco patented construction the actual pressing pressure was effected only by the foot-pedal-operated yoke to which the upper shoes were pivotally connected; and (3) that the Amco leveling springs had nothing to do with applying pressing pressure." (Emphasis in original.)[2]
 
 
 98
 Most important, however, is the fact that the court's elevation of "parallel pressure" is without any lower court findings and is not supported by any evidence at all. If by that term my brothers mean that the pressing surfaces of the upper and lower dies are parallel when the pressure is being applied, which is all that the record shows,[3] there is no evidence that Voigt considered this feature the "essence" of his invention. Nowhere in his long and detailed testimony at the trial was there any reference to a peculiar "parallel pressure"; the references were only to normal and well understood pressures. In the McAuley, the Beattie, and the second Kaplan machines, which all predate Voigt's efforts, the pressing surfaces are roughly parallel to each other when pressing the collar. While the dies in Voigt's device may be more precisely parallel than those in Beattie's or Kaplan's (but not McAuley's), there is no hint in the record that this minor difference improves even slightly the pressing of the collar or the efficiency of the machine. Additionally, my brothers' suggestion that Voigt's development of "parallel pressure" solved a long existing and vexing industry problem is quite without support. There is no evidence of any problem which was solved by Voigt's arrangement of two pivots and a spring. From the court's own opinion it appears that Beattie realized his pressing dies were not precisely parallel throughout the pressing operation, but thought nothing of it, and that McAuley and McTague did utilize "parallel pressure" in their machines and did not consider it of any significance. What manner of well known problem could this have been?
 
 
 99
 Concerning the plaintiff's commercial success on which my brothers so heavily rely, they declare: "We need not fix with precision the exact quantity of success attributable to the patentable as distinguished from the non-patentable features." But commercial success — at best a makeweight relevant only in the closest of cases, Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235, affirming Jungersen v. Baden, 2 Cir., 166 F.2d 807 — up to this time has been wholly ignored where it is not clearly attributable to the patented features of the successful product. Welsh Mfg. Co. v. Sunware Products Co., 2 Cir., 236 F.2d 225, 227; Wilson Athletic Goods Mfg. Co. v. Kennedy Sporting Goods Mfg. Co., 2 Cir., 233 F.2d 280, 283-284. Here, moreover, plaintiff's commercial success is quite clearly not due to the Voigt patent. It will be recalled that, due to the protection of the McAuley-Beattie patent umbrella, Amco's only significant competitor was the Beattie machine. Of the two, the plaintiff's machine had the greater speed, produced a more uniform product, and was safer to operate; and the highly knowledgeable purchasers of such machines quickly recognized its advantages.[4] But all these advantages over the Beattie collar-former are attributable entirely to earlier invention and specifically to other features of the plaintiff's machine than those covered by Voigt's patent.[5] It needs reiterating that on the plaintiff's complex and precisely engineered piece of machinery the patent in suit covered only two simple pivots and an irrelevant spring, and these parts performed only limited functions. The pivots transmitted to the collar press the pressure of the operator's foot on the treadle; and the leaf spring facilitated the removal of the pressed collar from the pressing recess by holding the pointed end of the upper pressing die away from the surface of the collar when the upper die was raised, thus fully opening the press. There is no evidence of any significant difference in the Beattie machine's performance of these simple functions. The pressing pressure seems to have been equally adequate to press the collars. And Beattie's foot-pedal arrangement worked equally well in fully opening the press, so that the pressed collars could be removed with equal facility. In short, the commercial success of the plaintiff's collar pressing machine was not caused by Voigt's patented mechanism; and this "novel" mechanism is in fact as simple and common as it first seems. We have not been in the habit of treating such gadgets so favorably heretofore. For a recent example of our settled approach, see Savoy Leather Mfg. Corp. v. Standard Brief Case Co., 2 Cir., 261 F.2d 136.[6]
 
 
 100
 On the other branch of the case, the court's reversal of the decision below to hold that the defendants have engaged in unfair competition is even more novel and troublesome. "Fraudulent marketing," as the court here defines it — or rather declines to define it — seems to amount to no more and no less than the defendants' unquestionably privileged copying of plaintiff's machine. Although the court declares that "Problems relating to the extension and development of ["the law of unfair competition"] into areas beyond `passing off' are not within the purview of this case," as the plaintiff itself concedes,[7] this case is not by the wildest stretch of the imagination one of "passing off." There is no evidence that any or all of defendants' so-called fraudulent practices created the slightest likelihood that a purchaser would be misled into buying defendants' machine while intending to buy the plaintiff's; and I do not understand the court to hold clearly erroneous the trial court's finding that plaintiff's machine had not acquired a secondary meaning. Indeed, the court's opinion seems to hold all these matters irrelevant. It states that "It is not necessary that the source [of plaintiff's products] be the primary motivation for purchase," and that it is not "disposed to debate in detail the probabilities of confusion"; and it not only finds that defendants sought "to create the impression that while in business for themselves they were authorized to make and sell Amco machines," but also disapprovingly notes that "On the other hand, if some purchasers did not even realize that Schreiber & Goldberg were manufacturing Amco machines, Schreiber & Goldberg were not averse to benefiting from this misapprehension as well."
 
 
 101
 While such vague and inconsistent charges must fall of their own weight, it is useful to note that none of the more specific charges of misconduct which the court levels against the defendants are supported by the record — except, of course, for the copying of the machine itself. As the majority concedes, defendants made no serious attempt to hire away plaintiff's employees. Moreover, the evil inferences which the majority draws from the fact that defendants sold many machines with used Amco parts on them are conclusively negated by the clear evidence in the record that every one of these machines was sold as a rebuilt, not a new, machine. Indeed, on many occasions the purchaser himself supplied defendants with the secondhand Amco parts and requested that they be used on the machine.
 
 
 102
 The court also dwells at length on defendants' so-called fraudulent advertising. But the majority's own opinion, as well as the fact that the trial court did not think plaintiff's charges here sufficiently serious to warrant specific findings, amply reveals the state of the record in support of this claim. The principal evidence consists of four advertisements of the collar pressing machine, all prominently featuring the name Schreiber & Goldberg, which included in a list of defendants' sales representatives two concerns which were then handling only the plaintiff's collar pressing machine, but selling many other products of the defendants. The contemporary correspondence in the record strongly supports the defendants' here summarily dismissed claim of honest mistake in linking these distributors also with their collar presser. But even if this claim be rejected, I cannot see how my brothers can be so certain — without findings or mention by the trial judge and as far removed as we are from this equivocal proof — that these advertisements, which did not mention plaintiff at all, constituted a representation that Schreiber & Goldberg were in some manner connected with the plaintiff. Secondly and finally there is evidence that a southern sales representative of the defendants, not the defendants themselves, once advertised a collar-forming machine in their own catalogue by featuring a picture which could have been either the plaintiff's or the defendants' machine and the name of the manufacturer was not stated. Apparently, however, this omission was never repeated. This paltry showing is the sum total of the evidence of defendants' fraudulent advertising; and there is no other evidence of any kind which lends support to the finding of unfair competition.
 
 
 103
 Hence the "record of wilful and cunningly contrived pirating" reduces itself to nothing more than the copying of the Amco machine. The majority repeatedly condemns this copying. But as they also concede, it is one of the most well-settled principles in the uncertain law of unfair competition that, absent palming off, secondary meaning, and deceit, competitors are wholly privileged to copy another's product. See Paramount Industries v. Solar Products Corp., 2 Cir., 186 F.2d 999, 1001-1002, and cases there cited. Indeed, even if defendants were guilty of fraudulent advertising, trademark infringement, or the like — which is patently not the case here — the protection of the public interest in free competition requires that only the fraudulent or illegal activity, and not defendants' copying of the plaintiff's machine, be enjoined. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 532, 44 S.Ct. 615, 68 L.Ed. 1161; Estate Stove Co. v. Gray & Dudley Co., 6 Cir., 41 F.2d 462, vacated on other grounds, 6 Cir., 50 F.2d 413. We have only recently unequivocally reaffirmed these principles in Modern Aids, Inc. v. R. H. Macy & Co., 2 Cir., 264 F.2d 93, 94, where the court stated Per Curiam: "The plaintiff had no patent, and except for one proviso the defendant was free to imitate its machine as closely as it chose, no matter how much the competition might lessen the plaintiff's sales. That proviso was that, if the buying public had come to believe that every machine made after the plaintiff's model was the plaintiff's product, and had in any degree relied upon the source of the machine, rather than its performance, the plaintiff might have some relief. Even then, however, the relief would go no further than to require the defendant to make plain to buyers that the plaintiff was not the source of the machines sold by it."
 
 
 104
 How far this simple and clear-cut statement of heretofore well settled law is now to be confused and confounded is brought into bold relief by the majority's ambiguous mandate to the district court. I can only hope that that court can understand it more than do I and does not hold itself required to go to the extremes hinted at or implied. For if I read it a-right, the direction appears to be that the defendants must pay over all profits derived from copying plaintiff's machines, despite the law's authorization and encouragement of this copying once plaintiff's limited patent monopoly is over. Although my brothers concede that this copying was privileged, I see no narrower rational limit to the accounting they order. For there does not seem to be much else to which a claim for an accounting may attach. Surely no damage to plaintiff or even specific profits of the defendants can be attributed to the meager bits of claimed unfair advertising so played up in the opinion. Additionally, the proposed injunction — to restrain defendants from fraudulent marketing "by advertising and otherwise" — seems intended to buttress plaintiff's monopoly further by not discriminating between privileged and non-privileged acts. This result totally blots out all ending of plaintiff's monopoly when its patent ended and is quite upsetting to all patent law. It seems to me truly ironical that the end result of the involved course of reasoning here pursued is that the defendants must account for marketing the machines now in the public domain. Thus is the constitutional purpose of securing exclusive rights to inventors in their discoveries for limited times (U.S.Const. Art. 1, § 8) frustrated.
 
 
 105
 I confess I cannot perceive the reason or occasion for this decision. Apparently my brothers have taken offense at defendants' competitive practices; thus they deem "intolerable" defendants' efforts to break the plaintiff's monopoly when its legal term had run. But this reaction constitutes a thorough repudiation of the American doctrine of free competition. In final analysis their decision must be a tribute to the lawyer's craft, shown here in various aspects,[8] in painting a spurious picture of low cunning and sly skulduggery so ineradicable that it does not fade even upon a demonstration of its lack of basis in the evidence and of the legally permissible character of the defendants' acts. In my view the record in the first action involving patent No. 2,090,318 requires affirmance upon the plaintiff's appeal and a reversal for dismissal on the defendants' appeal.
 
 
 106
 I agree with the reversal and dismissal in the second action.
 
 
 
 Notes:
 
 
 [1]
 Thus see the second paragraph of the patent:
 "An important feature of my device is the provision of a reciprocating die plate, which is adapted to be located within the plies of the material which form the garment, and which serves to carry the garment into the dies in which pressure is applied to the garment and to be removed before the pressure is applied to the exterior of the garment. In the die plate, I have provided means for gently but firmly locating the garment in accurate position within the dies, this means being withdrawn from the dies before the pressure is applied to the garment. It is thus possible to secure a more rapid and accurate finish of the garments operated on than in the devices of the prior art."
 
 
 [2]
 Concerning this same spring the majority's dismissal of the prior McTague device is also odd. McTague, my brothers say, did not anticipate Voigt because: "His link arrangement seems to have been intended solely to facilitate the insertion and removal of the collar. A parallel relation between the upper and lower dies is stressed only `at the limit of the separating movement,' and not when the pressure is applied." But this language could not more accurately describe the differences between the Voigt leaf spring and the defendants' cross bar which, the court holds, infringes plaintiff's patent. Patentees in this court have not always so easily slipped by the Scylla of anticipation and the Charybdis of noninfringement. See Zoomar, Inc. v. Paillard Products, 2 Cir., 258 F.2d 527, certiorari denied 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed.2d 230
 
 
 [3]
 The court's statement that "in the Amco machine the pressure is effected in a direction lengthwise of the center line of the collar" is incorrect and without support in the record. Plaintiff's machine merely presses down on the collar in a direction perpendicular to its surface in the ordinary manner followed by McAuley, Beattie, and McTague in their machines. The only machines in evidence which applied pressure in the described direction were the two Kaplan devices — both prior to Voigt's and both unsuccessful
 
 
 [4]
 The court's own statement is:
 "The advantages of the Voigt [Amco] double point collar-presser over the Beattie single point machine include not only its simplicity and the greater speed made possible thereby, but the manufacture of a more uniform product, in the words of the patent, `a more rapid and accurate finish.' The double point die blades are complementally shaped to receive opposite pointed end portions of the turned collar so that both of the end portions may be pressed simultaneously without reversing them top from bottom as was necessary with the Beattie machine. This means that both sides of the collar receive a uniform sheen from the double point pressing, a result only haphazardly obtained from single point pressing. In addition, the Voigt [Amco] machine produces a smoother product and its pedal actuated internal die-blade makes it safer to use since it is not necessary for the operator's fingers to come near the heated pressure area."
 
 
 [5]
 Note that the features specifically mentioned by the majority, note 4 supra, are all outside the Voigt patent — the foot pedal operation of the die blade and the die blade's double pointed shape. The evidence adduced below strongly suggests that this latter feature, concededly in the public domain, was the most significant single factor in Amco's commercial success. Not only did the double-point construction produce a more uniform sheen as the majority states, but it greatly increased the speed of the pressing operation; two collar points could be pressed at the same time on the double pointed blade (the Beattie machine pressed only one at a time), and the movements required to fit the collars on the blades were simpler with a double pointed blade
 
 
 [6]
 Other examples could of course be multiplied; their character is sufficiently indicated by Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235, affirming Jungersen v. Baden, 2 Cir., 166 F.2d 807; Great Atlantic & Pac. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Bostitch, Inc. v. Precision Staple Corp., 2 Cir., 178 F.2d 332; Lenox v. Landers, 2 Cir., 188 F.2d 744; Kleinman v. Kobler, 2 Cir., 230 F.2d 913, certiorari denied 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51; Welsh Mfg. Co. v. Sunware Products Co., 2 Cir., 236 F.2d 225; Magnus Harmonica Corp. v. Lapin Products, 2 Cir., 236 F. 2d 285; Zoomar, Inc. v. Paillard Products, Inc., 2 Cir., 258 F.2d 527, certiorari denied 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed. 2d 230; Savoy Leather Mfg. Corp. v. Standard Brief Case Co., 2 Cir., 261 F.2d 136; Surgitube Products Corp. v. Scholl Mfg. Co., 2 Cir., 262 F.2d 824. The few old cases cited in the opinion to this point are not apposite
 
 
 [7]
 "In holding that defendants have not unfairly competed with plaintiff in the sale of their double point collar forming and shaping machines, the District Court undoubtedly was under the misapprehension that unfair competition could and should be enjoined only if it involved `passing off' one product as that of another. In view of the record herein no other interpretation can be given for Judge Sugarman's decision, but this palming off concept is much too limited and certainly does not apply in this case. The fact is that the defendants herein, with deliberate intent, copied the plaintiff's machines so that they could in effect sell `Amco' machines." Plaintiff-Appellant's Brief, pp. 58-59
 
 
 [8]
 Not least is the wile displayed in bringing two actions instead of one, resulting in wide elaboration of the simple issues and no less thanfifteen printed booklets on appeal — a consequence which should have merited a penalty of costs and in fact seems to have led to the confusion of opposing and self-cancelling cost awards.
 
 
 
 107
 On Petition for Rehearing.
 
 
 108
 PER CURIAM.
 
 
 109
 Petition for rehearing denied.
 
 
 110
 CLARK, Chief Judge (dissenting).
 
 
 111
 I regret that my brothers have not felt impelled to attempt to fill the gaps in proof and legal principle in their novel decision underscored by the petition for rehearing. But there is no object in parading those difficulties again. The situation is otherwise, however, as to the petitioners' quite proper request for clarification of the mandate. It is a not unusual practice, followed below, to refer proceedings for accounting to a master to hear and report. Unless the purport and extent of the accounting herein is to be made considerably clearer than it now is, these delaying and expensive proceedings are likely to prove abortive on eventual report to the district court and review by us.
 
 
 112
 Since my brothers have found Patent No. 2,090,318 valid for the few years of life remaining to it until 1954, it would be consistent to require payment for infringing copying during that period if it can be shown that defendants did copy the weak features of that patent beyond what was already public property. But the accounting for "the damages sustained and profits lost by Amco by reason of the fraudulent practices described in this opinion" remains wholly vague. Seemingly the fraudulent practices consisted in the defendants falsely representing themselves as agents of the plaintiff — with what reason or purpose is not clear, since they were then legally authorized themselves to produce and market the machines now in the public domain. To avoid obvious confusion I think it should be made clear (a) that defendants may freely copy the machines in the public domain and (b) that damages (beyond the patent infringement noted above) must be limited to commissions on such sales, if any, of defendants' machines as were effected by the defendants through their false representation of agency. And, if the patent law has any meaning, the injunction should likewise be limited so as not to restrict defendants' right and privilege to market machines no longer covered by patents and in the public domain. Our unanimous decision in Modern Aids, Inc. v. R. H. Macy & Co., 2 Cir., 264 F.2d 93, 94, still states the law of this circuit; and my brothers do not purport by their mandate to overrule or limit it.